

|  |  |
|---|---|
|  | **U.S. Department of Justice** |
|  |  |
|  | *United States Attorney* |
|  | *Eastern District of New York* |
| NJM:AAS/ANR | *271 Cadman Plaza East* |
|  | *Brooklyn, New York 11201* |

May 16, 2025

<u>By ECF and E-mail</u>

The Honorable Nina R. Morrison
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    <u>United States v. Chen Jinping</u>
                <u>Criminal Docket No. 23-316 (NRM)</u>

Dear Judge Morrison:

       The government respectfully submits this letter in advance of defendant Chen Jinping's sentencing, which is scheduled for May 30, 2025, and in response to the defendant's sentencing memorandum, which was filed on May 1, 2025 (ECF No. 57). On December 18, 2024, the defendant pleaded guilty to Count One of the above-referenced indictment (ECF No. 24) (the "Indictment"), which charged him with conspiring to act as an agent of the government of the People's Republic of China (the "PRC" or "China") without prior notification to the Attorney General, in violation of 18 U.S.C. § 371, based on his role in the operation of an illegal PRC government-run police station in lower Manhattan. For the reasons below, the government respectfully submits that a sentence of 36 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case, given the defendant's role in helping the PRC government undermine U.S. sovereignty and his efforts to obstruct justice in the government's investigation into his conduct. Such a sentence would constitute just punishment, reflect the severity of the defendant's conduct, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offense.

       I.    <u>Factual Background</u>

       This case represents the first known prosecution related to the PRC government's practice of opening and operating undeclared police stations in foreign nations, to assist the PRC government in enforcing its laws throughout the world.

       The defendant, along with his co-defendant Lu Jianwang and others, operated what functioned as a police station (the "Undeclared Police Station") in New York City on behalf of the PRC's Fuzhou Municipal Public Security Bureau ("FPSB"), a provincial branch office of the PRC

Ministry of Public Security ("MPS") located in the Fujian Province of the PRC. (Presentence Investigation Report ("PSR") ¶¶ 4, 20).

Once confronted with the Federal Bureau of Investigation's ("FBI's") investigation into his illegal conduct on behalf of a foreign sovereign, the defendant destroyed electronic evidence of his communications with his primary liaison at the MPS ("MPS Official-1"), who had conspired with the defendants to operate the Undeclared Police Station, seeking to shield the PRC government's efforts to undermine U.S. sovereignty. (PSR ¶ 4). Notably, MPS Official-1 was the Director of the Overseas Chinese Affairs Office within the FPSB. (PSR ¶ 8).

The defendant was among the leaders of a nonprofit organization based in lower Manhattan, New York, that was established in 2013 and lists its charitable mission as a "social gathering place for Fujianese people" (the "Association"). (PSR ¶ 5). The defendant served as the Secretary General of the Association. (PSR ¶ 6). The PRC government, with the collaboration of the defendants, used the Association to operate the Undeclared Police Station.

### A. The MPS and the United Front Work Department

Although the MPS is generally identified as the PRC's primary domestic law enforcement agency responsible for public safety, general criminal investigation, national security and internet security, its mission extends beyond law enforcement and into functions more associated with an intelligence service. The MPS routinely monitors Chinese political dissidents who live in the United States and in other locations outside the PRC. The MPS has used cooperative contacts, like the defendant, both inside the PRC and around the world to influence, threaten and coerce political dissidents abroad. (PSR ¶ 12).

According to an August 2018 report published by the U.S.-China Economic and Security Review Commission, the United Front Work Department of the Central Committee of the Chinese Communist Party ("UFWD") coordinates the "United Front" strategy to co-opt and neutralize sources of potential opposition to the policies and authority of the Chinese Communist Party ("CCP"). The report further states that the UFWD attacks its mission using a range of methods, including "influencing overseas Chinese communities, foreign governments, and other actors to take actions or adopt positions supportive of Beijing's preferred policies….United Front work serves to promote Beijing's preferred global narrative, pressure individuals living in free and open societies to self-censor and avoid discussing issues unfavorable to the CCP, and harass or undermine groups critical of Beijing's policies." (PSR ¶ 13).

### B. Co-Defendant Jianwang's Relationship of Trust with the PRC Government

Co-defendant Jianwang has had a longstanding relationship of trust with the PRC government and, in particular, the MPS and the UFWD, including providing assistance in locating individuals of interest to the PRC government. For example, in 2018, an individual of interest to the PRC government ("Victim-1") was harassed by the Association to return to the PRC. The harassment included repeated unsolicited telephone calls from purported members of the Association and threats of violence to Victim-1 regarding family members of Victim-1 residing in the United States should Victim-1 refuse to repatriate to the PRC. Members of Victim-1's family

2

in the PRC had been harassed by MPS officials since Victim-1's arrival in the United States. (PSR ¶ 18).

In 2020, another member of the Association ("CC-1") contacted Jianwang to help to locate another PRC national in the United States ("Victim-2"). CC-1 sent Jianwang identifying information for Victim-2 and a surreptitiously taken photo of Victim-2 sitting in a public park. CC-1 claimed that CC-1 needed information about Victim-2 related to a lawsuit.

Additionally, MPS Official-1 asked Jianwang to help locate a PRC dissident residing in California, and Jianwang passed the request on to a leader of another local Chinese-diaspora association in the metropolitan New York area ("CC-2"). (PSR ¶¶ 10-11, 19.)

C. The Creation and Operation of the Undeclared Police Station

In 2022, the FPSB established the Undeclared Police Station at the Association's offices in lower Manhattan (the "Manhattan Premises"). None of the persons working at the Undeclared Police Station, including the defendant, had provided prior notification to the Attorney General that they would be working in the United States on behalf of the PRC government. (PSR ¶ 20).

On January 10, 2022, the FPSB officially launched an initiative with the goal of establishing overseas police service station facilities worldwide in a ceremony held at Wuyi Square Park, Fuzhou, PRC, which Jianwang attended. (*Id.*). A senior official ("UFWD Official-1") within the Fuzhou All-China Federation of Returned Overseas Chinese ("Fuzhou AFROC"), a known UFWD organization, approached Jianwang about the station. UFWD Official-1 informed Jianwang that many overseas Chinese from Fuzhou could not return to the PRC due to the pandemic and that establishing a police station to renew Chinese government documents would be expedient. (PSR ¶¶ 9, 20). UFWD Official-1 invited Jianwang to a meeting with the FPSB officials to discuss the establishment of the Undeclared Police Stations in countries across the world. During a subsequent meeting, UFWD Official-1 introduced Jianwang to MPS Official-1, an individual whom UFWD Official-1 credited with establishing overseas police stations worldwide. (PSR ¶ 20).

On February 15, 2022, the FPSB and the Association established the Undeclared Police Station. The defendant and Jianwang were two of seven Association members (the "Undeclared Police Station Principals") responsible for overseeing operations of the Undeclared Police Station. (PSR ¶ 21). Although Jianwang was initially responsible for coordinating the opening of the Undeclared Police Station with the FPSB, he delegated the responsibility to the defendant, who in turn delegated the responsibility to another Undeclared Police Station Principal (the "Delegate"). The defendant and the Delegate served as the primary points of contact with the FPSB as to daily operations of the Undeclared Police Station. (PSR ¶ 22). The defendant and the Delegate were responsible for processing Chinese driver's license applications and coordinating interviews for such applications at the Undeclared Police Station.

After the opening of the Undeclared Police Station in February 2022, MPS Official-1 tasked the co-conspirators on at least one occasion with locating a person of interest to the PRC government—a person who was ultimately harassed and threatened. On March 24, 2022, MPS

3

Official-1 sent Jianwang an electronic message directing him to confirm the location of an individual residing in California ("Victim-3"). MPS Official-1 wrote that he/she had a friend who was looking for Victim-3 for personal reasons, and that there was no need for Jianwang to contact Victim-3 directly but that he should simply confirm Victim-3's existence. Notably, Victim-3 is a PRC dissident and PRC pro-democracy advocate who served as an advisor to a 2022 Congressional candidate from New York State (the "Candidate") who had been a leader in the 1989 Tiananmen Square protests for political reform in Beijing, PRC. (PSR ¶ 23). The Candidate himself was also the victim of a separate PRC transnational repression effort involving the Ministry of State Security (the "MSS").[1] *See United States v. Qiming Lin*, No. 22-MJ-251 (E.D.N.Y.).

Thereafter, Jianwang made efforts to locate the individual. (PSR ¶ 24). Victim-3 indicated to FBI agents that he/she has been harassed on multiple occasions by individuals whom he/she believes to be proxies for the PRC government, including having his/her vehicle broken into immediately after delivering a pro-democracy speech, and receiving harassing telephone calls and electronic messages from social media accounts that Victim-3 assessed to be associated with the PRC government. (PSR ¶ 24).

D. Media Reports Related to the Undeclared Police Station

On April 30, 2022, the PRC media outlet FJSEN.com reported that the FPSB, in coordination with the Association, had established the Undeclared Police Station on February 15, 2022. The FJSEN.com article reported that (1) the Undeclared Police Station helps Chinese citizens living in the United States schedule applications to renew Chinese driver's licenses through the PRC-based encrypted messaging application WeChat; (2) the Undeclared Police Station electronically submits the application to the FPSB's Traffic Management Center in Fuzhou, PRC; and (3) an applicant may schedule an appointment at the Association for a virtual exam and interview with the FPSB after the PRC government has reviewed and approved the application. (PSR ¶ 25.)

On September 12, 2022, a pan-Asian non-government human rights organization published a report titled "110 OVERSEAS: Chinese Transnational Policing Gone Wild." According to the report, MPS Official-1 announced on January 22, 2022, that the FPSB had opened its "first batch" of 30 overseas police service stations or "110 overseas stations" in 25 cities in 21 countries. The report cited an article from PRC news outlet chinanews.com reporting that, by June 2022, the FPSB had opened another thirteen stations—bringing the total number of overseas police stations to 38. The report stated that "110 overseas stations" were "openly labeled as overseas police service stations to accommodate the growing administrative needs of Fuzhou residents abroad—for example in renewing Chinese driver's licenses remotely and other tasks traditionally considered of a consular nature," but that they "also serve a more sinister goal as they contribute to 'resolutely cracking down on all kinds of illegal and criminal activities involving overseas Chinese.'" (PSR ¶ 26.)

---

[1] The MSS is the foreign intelligence and secret police agency of the PRC government responsible for counterintelligence, espionage and political security.

4

On September 24, 2022, FJSEN published an online article about another overseas Chinese association and another U.S.-based Chinese entity operating another undeclared overseas station in New York City offering license renewal services. On the same day, MPS Official-1 tasked the defendant with removing the article from the FJSEN website by sending a message to the individual who operates the website. The defendant sent a screenshot of his correspondence with MPS Official-1 to the FJSEN principal, and the FJSEN principal confirmed to the defendant that he/she had removed the article. (PSR ¶ 27).

### E. The Defendant's Obstruction of Justice

On October 3, 2022, FBI agents searched the Manhattan Premises. During the search, agents located an Undeclared Police Station banner as well as electronic equipment consistent with renewing driver's license applications. (Compl. ¶ 33). In conjunction with the search, the FBI conducted consensual interviews of the Undeclared Police Station Principals, including the defendant, and gained access, either through consent or judicial authorization, to the cellular devices of the Undeclared Police Station Principals. In multiple instances, WeChat communications with FPSB officers had been deleted from the devices. (*Id.* ¶ 34). Review of seized devices revealed that Association officials hosted officials from the PRC Consulate of New York at the Manhattan Premises on April 21, 2022. (*Id.* ¶ 35). During this event, the Association president acknowledged establishment of the Undeclared Police Station at the Manhattan Premises. (PSR ¶ 28).

In an October 3, 2022 interview with FBI agents, the defendant repeatedly denied his involvement with the Association. (Compl. ¶ 48). The defendant also claimed he did not have direct contact with the PRC government. (*Id.* ¶ 51). During the interview, the defendant went into the restroom while in possession of his cell phone. Agents spoke to the defendant through the bathroom door and advised him repeatedly not to delete anything from his phone. The defendant left the restroom several minutes later. Thereafter, the defendant's phone was seized to prevent the destruction of evidence. On October 11, 2022, the government obtained a search warrant for the defendant's cell phone. (*Id.* ¶ 53).

Reviewing agents were unable to locate WeChat communications with MPS Official-1 on the defendant's phone, even though the defendant had sent screen shots of his communications with MPS Official-1 to Jianwang, as described above. (*Id.* ¶ 54.) Additionally, a review of photos found in the defendant's phone revealed a screen shot of WeChat communications between the defendant and MPS Official-1 occurring on or about October 1, 2022—two days before the search of the Manhattan Premises—indicating that the defendant had deleted his WeChat communications with MPS Official-1 no earlier than October 1, 2022. (*Id.* ¶ 56.)

Agents reinterviewed the defendant several months later. During the second interview, the defendant admitted to his involvement and role in the Association. The defendant also confirmed his role in the operation of the Undeclared Police Station and admitted it was run at the direction of the FPSS/MPS. (*Id.* ¶ 67). When asked when and why the defendant had deleted his chats with representatives from the FPSB, the defendant initially stated that he did not know when he had deleted the chats but admitted that he had done so because the interlocutors were

5

government officials, and claimed he did not need the chats. (*Id.* ¶¶ 68-69). When asked again why and when he had deleted the WeChat messages, the defendant admitted that he had done so "on or around the day he spoke with the FBI probably the day after." (*Id.* ¶ 69). After receiving a candor warning and being reminded that he did not delete the chats the day after the interview because the chats were not on the phone that the FBI had seized from him, the defendant initially responded that he "did not remember" and then claimed that he had done so "on or around the day he spoke with the FBI." (*Id.*). When asked if the defendant had deleted the chats because he was afraid the FBI would find them, the defendant replied he deleted the chats because, among other reasons, he knew the FBI would be interested in the communications on the chats (including the participants in the chats and content of the chats). Agents asked the defendant if he had deleted the WeChat communications while in the bathroom during his initial interview. The defendant initially responded, "No." (*Id.*). Agents then showed the defendant application logs from his device reflecting WeChat activity during the time he was in the bathroom and asked again if the defendant had deleted the WeChat messages in the bathroom. The defendant admitted, "It's possible it happened in the bathroom" and further admitted that he had deleted both contacts and chats. (*Id.*).

In response to further questioning, the defendant admitted that he had deleted at least four different WeChat chat communications: (1) a "global" WeChat group chat that included multiple Chinese associations throughout the world; (2) a "larger" New York WeChat group chat that included many New York-based individuals; (3) a "smaller" New York WeChat group chat that included identified individuals who were seeking help from the Association; and (4) a chat with MPS Official-1. (Compl. ¶ 70). Notably, the defendant first implausibly claimed there were no personal chats with MPS Official-1. When shown a photograph of a WeChat communication with the Deputy Director of the FPSB, the defendant confirmed that he had also deleted that chat. (*Id.*).

II.  Applicable Law

The Supreme Court has explained that the sentencing court "should begin all sentencing proceedings by correctly calculating the applicable [Guidelines] range. *Gall v. United States*, 552 U.S. 38, 49 (2007). The Supreme Court further has explained that "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Id*. The sentencing court "should then consider all of the [18 U.S.C.] § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. at 49-50. In doing so, the court "may not presume that the Guidelines range is reasonable," but "must make an individualized assessment based on the facts presented." *Id*. at 50 (internal citation omitted).

Title 18, United States Code, Section 3553(a) provides, in part, that in imposing a sentence, the court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--

6

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; [and]

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

  At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 512-13 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

 III. <u>Guidelines Calculation</u>

  As described below, the parties and the United States Probation Department ("Probation") agree that the provisions of 18 U.S.C. § 3553 control the imposition of the appropriate sentence in this case because no Guideline has been promulgated for the underlying substantive offense, 18 U.S.C. § 951, and there is no sufficiently analogous Guideline. (ECF No. 57 at 3; PSR ¶¶ 29, 33.)

 IV. <u>Argument</u>

  For the reasons below, the government respectfully submits that a sentence of 36 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. Specifically, such a sentence would constitute just punishment, reflect the severity of the defendant's offense, promote respect for the law, and provide the specific and general deterrent effect called for by the defendant's offense. In contrast, the defendant's requested non-custodial sentence would not further the objectives of sentencing in this case.

   A. There Is No Analogous Guideline and Accordingly the Provisions of Section 3553 Control

  The parties and Probation agree that there is no analogous Guideline for Section 951 offenses, and accordingly that the factors under 18 U.S.C. § 3553(a) control. (ECF No. 57 at 3; PSR ¶¶ 29, 33.) For the Court's convenience, the government nevertheless details the legal basis for relying upon the Section 3553(a) factors.

7

As background, the appropriate offense level under the Guidelines is typically determined by reference to the statutory index contained in Appendix A to the Guidelines. *See* U.S.S.G. § 1B1.2(a). For statutory violations that are not listed in the appendix, the Guidelines instruct that the "most analogous offense guideline" is to be used. U.S.S.G. § 2X5.1. Where, however, there is no sufficiently analogous Guideline provision, the Court is to sentence the defendant anywhere within the statutory sentencing range based on application of the Section 3553(a) factors. *See* U.S.S.G. § 2X5.1 ("If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control."). As relevant here, courts routinely have held that no sufficiently analogous Guideline provision applies to convictions for violating 18 U.S.C. § 951. *See, e.g.*, *United States v. An*, No. 22-CR-460 (S-1) (E.D.N.Y) (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for engaging in Operation Fox Hunt activities on behalf of the PRC government) (Ex. A at 80:5-12); *United States v. Zhu*, No. 21-CR-265 (S-1) (E.D.N.Y.) (same and specifically finding that stalking Guidelines were not sufficiently analogous because, unlike the stalking offense, the critical element of the § 951 offense is the defendant's knowing involvement with a foreign government to carry out that government's directives in the United States without providing the required notification) (Ex. B at 11:12-13:3); *United States v. Buryakov*, No. 15-CR-73 (S.D.N.Y.), ECF No. 158 at 6-7, 17 (finding no sufficiently analogous Guideline provision where defendant was convicted of violating § 951 for agreeing to provide information to Russian official); *United States v. Chun*, No. 16-CR-618, ECF No. 17 at 10 (S.D.N.Y.) (parties jointly submitted there was no analogous Guideline and court agreed where defendant was convicted of violating § 951 for providing sensitive information to Chinese officials); *United States v. Butina*, No. 18-CR-218, ECF No. 120 at 11-12 (D.D.C.) (observing that "[t]he majority of the courts that have dealt with this issue have determined that § 951 does not have a sufficiently analogous guideline" and similarly finding no sufficiently analogous Guideline provision for conspiracy to violate § 951).

Here, too, no sufficiently analogous Guideline applies to the defendant's conviction for conspiring to act as an illegal agent of a foreign government, in violation of 18 U.S.C. § 951. Accordingly, the provisions of 18 U.S.C. § 3553(a) control. *See* U.S.S.G. § 2X5.1. Based on application of the Section 3553(a) factors without reference to any Guideline calculation, the Court may sentence the defendant anywhere within the statutory range of zero to the statutory maximum of 5 years' imprisonment.

### B. Analysis of the Sentencing Factors Under Section 3553(a)

Section 3553(a) requires courts to consider various factors in imposing a sentence, including the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to serve as a deterrent, and the need to avoid unwarranted sentencing disparities. For the reasons below, analysis of these factors supports imposing a sentence of 36 months' imprisonment.

#### i. The Nature and Circumstances of the Offense and Related Conduct

##### a. The Operation of the Undisclosed Police Station

The defendant's role in the opening and operation of the Undisclosed Police Station warrants a sentence of 36 months' imprisonment. The defendant furthered the PRC government's

8

unlawful operations of an undeclared police station on U.S. soil—conduct which fundamentally undermined U.S. national security and sovereignty. Such conduct is extraordinarily serious and has had a deleterious effect on the lives of Chinese dissidents living in the United States who are persistently surveilled and harassed by the PRC government and its unregistered foreign agents. Indeed, the successful targeting by the PRC government of individuals living in the United States depends on the willing participation of U.S.-based assets such as the defendant.

The defendant ensured successful operations of the Undeclared Police Station in at least three ways. First, the defendant was a leader of the Association and one of three people trusted as regular interlocutors for the CCP officials responsible for operations of the overseas police station.

Second, the defendant personally engaged in repressive activity, including by causing a PRC media outlet to cease publication of an article regarding the Undeclared Police Station. The suppression of the FJSEN article symbolizes the success of an authoritarian state in controlling public narratives about its own repressive activities.

Finally, the defendant attempted to shield the CCP's illegal activity on U.S. soil from U.S. law enforcement authorities. The defendant lied to law enforcement agents and destroyed evidence of his communications with PRC government officials responsible for orchestrating the unlawful scheme.

In sum, while the defendant played a foundational role in opening and operating the Undeclared Police Station and using it as a front to engage in transnational repression, he exacerbated his criminal conduct by obstructing justice. The defendant's obstruction was successful insofar as the FBI was unable to relocate some of the messages he deleted. Obstruction of justice is a particularly insidious offense because it undermines law enforcement's capacity to fully investigate serious criminal activity and erodes public confidence in the legal system. Moreover, in this context, the defendant's obstruction literally prioritized the impunity of the CCP over the sovereignty and legitimacy of the United States government.

### ii. The History and Characteristics of the Defendant

The defendant lacks any criminal convictions, and the government does not contest the assertions of those who have written letters concerning the defendant's personal history and family relationships. Nevertheless, the crime of conviction does not represent aberrant behavior; the defendant is charged with dedicating himself on a consistent basis to accomplishing and hiding the unlawful ends of a repressive government.

### iii. The Need for the Sentence to Serve as a Deterrent

The seriousness of the defendant's conduct warrants a term of imprisonment that would deter others both from undermining national security interests by illegally acting on behalf of foreign governments on U.S. soil and from causing substantial harm to victims in the United States by harassing and surveilling them and their families. Through its just punishment of the defendant in this case, the Court can send an appropriate message that such conduct is grave and will result in serious punishment.

The need for general deterrence is of paramount importance given the PRC government's well-established transnational repression activities in the United States, which undermine U.S. laws, norms, and individuals' rights. Indeed, in recent years, the PRC government repeatedly has engaged in Operation Fox Hunt activities here in this District. *See, e.g.*, *United States v. An et al.*, No. 22-CR-460 (KAM) (E.D.N.Y.) (defendant convicted of acting as an illegal agent of PRC government during five year scheme directed by PRC officials living abroad surveilled and harassed an individual wanted by the PRC government and his family members in the United States and abroad); *United States v. McMahon, et al.*, No. 21-CR-265 (PKC) (E.D.N.Y.) (four defendants convicted of, *inter alia*, acting as illegal agents of PRC government and/or conspiring to act as illegal agents of PRC government, in connection with multi-year scheme in which PRC nationals living in United States and various family members, both in the United States and in the PRC, were threatened in order to coerce the nationals' repatriation); *United States v. Wang*, No. 22-CR-230 (DC) (E.D.N.Y.) (defendant, the leader of an ostensibly pro-democracy Chinese dissident organization, convicted of acting as an agent of the PRC's intelligence services and passing information on dissident activities to MSS officers); *see also United States v. Ying*, No. 22-MJ-1711 (S.D.N.Y.) (charging at-large PRC national with conspiring to and acting as illegal agent of PRC government in connection with multi-year scheme in which PRC nationals living in United States and various PRC-based family members were threatened in order to coerce the nationals' repatriation, including by detaining a pregnant PRC-based relative, and alleging various conduct undertaken in furtherance of the scheme in the Eastern District of New York). Notably, the U.S. Department of Homeland Security has warned that the PRC "likely will continue to pursue transnational repression activity" in the United States – including the PRC's "global 'Operation Fox Hunt.'" *See* Office of Intelligence and Analysis, U.S. Dep't of Homeland Security, "Homeland Threat Assessment: 2024," available at https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf at 7 (last visited Feb. 21, 2025). The pervasiveness and seriousness of the Operation Fox Hunt conduct in the United States, and here in the Eastern District of New York, underscores the need for general deterrence. *See, e.g., United States v. Zhu*, No. 21-CR-265 (PKC) (E.D.N.Y.) ("We've been getting more and more of these prosecutions just as the Government notes in its submission. So it is necessary for the sentence I impose on Mr. Zhu to send a clear message to anyone else, who would seek to work for the Chinese Government for this purpose, and not register, that there will be serious consequences for doing so.") (Ex. B at 78:1-7).[2] A sentence of 36 months' imprisonment would serve as an appropriate warning to other potential PRC operatives and assets.

A serious sentence would also promote respect for the law in this case. The defendant undermined the government's investigation of the PRC government's incursion on

---

[2] *See also United States v. Li*, 24-CR-334 (M.D. Fla.), Hr'g Tr. (ECF 41) at 42 (recognizing need for § 951 sentencings to promote general deterrence, and reasoning "Because certainly the United States of America can, is entitled to, and arguably must convey to citizens, to visitors, and to all others who are interested that those who act against the interests of the United States in the category of offenses that is involved here will be punished in the United States and not in just a formalistic or perfunctory manner. It is a serious crime to cooperate with a hostile foreign power against the interests of the United States and against the laws of the United States. That seems to me an irreducible minimum for a case such as this.").

10

national sovereignty by deleting communications on his cell phone with PRC government officials about which communications the authorities were asking him at that exact moment. Such brazen efforts to violate and subordinate the laws and interests of the United States in favor of those of a foreign power underscore the need for a substantial punishment.

### iv. The Need to Avoid Unwarranted Sentencing Disparities

Recent cases in this district involving transnational repression schemes have resulted in imposition of serious terms of imprisonment.

In these cases, the presiding judges have noted the insidiousness of transnational repression schemes perpetrated by the PRC government. For example, in Zhu, No. 21-CR-265, Judge Chen found:

> [W]orking for a foreign government as an unregistered agent and stalking are both extremely serious crimes. There cannot be any debate about that. By committing the Section 951 offense, the defendant helped a foreign Government, the People's Republic of China conduct a campaign of—and this is using the Government's words—transnational repression against two individuals living in the United States and seeking refuge here, quite frankly. And that campaign included terrorizing their family members here and in the PRC. . . . These types of crimes are a threat to this country's national security. There can be no debate about that, as well.

(Ex. B at 76:11-77:3).

Similarly, in *United States v. An et al.*, 22-CR-460 (KAM) (E.D.N.Y.), Judge Matsumoto highlighted the need for general deterrence because "Operation Fox Hunt has fairly widespread adverse impacts on people living in the United States" and the importance of "deter[ing] other people who are citizens of foreign governments operating in our country to pressure, surveil, threaten people who are lawfully in the United States living here."). Exhibit A at 55:18-20; 56:3-6.

*Zhu*, *McMahon*, and *An* confirm the appropriateness of the requested sentence of 36 months. In *Zhu*, the defendant was convicted at trial of, *inter alia*, violating Section 951 and conspiring to violate Section 951. Beginning in 2016, Zhu and his co-conspirators acted with PRC government officials and others in the United States to harass and intimidate two victims into forcibly repatriating to the PRC. Zhu hired a private investigator, his co-defendant Michael McMahon, to locate the victims. Together Zhu and McMahon gathered information on the victims to provide to PRC officials. Zhu received a significant downward departure of 36 months' imprisonment, which is far from the non-custodial sentence that the defendant seeks in this case. At sentencing, Judge Chen primarily attributed the downward departure to the defendant's state of mind, characterizing him as "not a sophisticated person," and "naive and to a large extent, ignorant, about the harm he was causing these victims," and accordingly finding that he "really failed to understand or appreciate the gravity of what he was doing." (Exhibit B at 78:17-19, 81:12-82:1, 89:5-7.) Judge Chen expressly cautioned that Zhu's sentence should not "be cited as trying to

11

promote unwarranted disparities because," in Judge Chen's view, "there are many factors, personal factors, that . . . are at play here." (*Id.* at 89-90). Zhu's conduct is distinguishable from that of the defendant who did not fail to appreciate the gravity of his conduct, given his frequent WeChat group chats with PRC officials regarding operation of the Undeclared Police Station.

In *McMahon*, the defendant—a seasoned private investigator and former New York City Police Department sergeant—was hired to locate and target two Fox Hunt victims. McMahon surveilled the victims and provided photographs and other information about them which was passed to PRC government officials. Importantly, through McMahon's surveillance, he was able to locate the victims' home address, which the PRC government had not obtained prior to his involvement in the scheme. At sentencing, Judge Chen exercised leniency in imposing a sentence of 18 months, attributing that the variance to his prior public service as a law enforcement officer, including responding to Ground Zero after the 9/11 attacks. Judge Chen also noted that incarceration would be particularly difficult for him given his status as a former law enforcement officer.

Similarly, in *An*, the defendant pleaded guilty to conspiring to violate Section 951, after having been the U.S.-based leader of an Operation Fox Hunt scheme targeting a Chinese national residing in Long Island who had been accused of corruption in the PRC. Judge Matsumoto considered the seven months the defendant had spent in the Metropolitan Detention Center without receiving adequate medical care for a serious health condition and the defendant's charitable work in imposing a sentence of 20 months' imprisonment.

Unlike in those cases, this defendant's efforts—in addition to assisting analogous transnational repression—further undermined U.S. sovereignty. The defendant assisted in creating an official government office for the PRC that was not subject to the laws, regulations, or scrutiny that govern the operation of embassies, consulates, and missions. By creating a reality in which the PRC government could apply its laws and rules as it saw fit in the United States, without consulting with the United States, the defendant's crime undermined the sovereignty of the United States, in a way that Zhu, McMahon, and An did not.

For similar reasons, courts across the country have sentenced Section 951 defendants who have provided information to foreign governments about individuals living here in the United States to significant terms of incarceration. *See United States v. Alvarez*, No. 05-CR-20943 (S.D. Fla.) (ECF Nos. 228, 236) (defendant pleaded guilty to conspiracy to act as an illegal foreign agent sentenced to 60 months' imprisonment for serving as an agent of Cuba's Directorate of Intelligence and its predecessor intelligence agencies, gathering information within the United States on matters of interest and shared sensitive, non-public information about specific individuals of interest to the Cuban government); *United States v. Li*, 24-CR-334 (M.D. Fla.) (ECF No. 39) (pleaded guilty to conspiracy to act as an illegal agent of the PRC and was sentenced to 48 months' imprisonment for working at the direction of officers of the PRC Ministry of State Security over an approximately ten-year period to obtain information of interest to the PRC government, including information concerning dissidents and pro-democracy advocates and members of the Falun Gong religious movement; most of the information he provided was publicly available); *United States v. Cabrera Fuentes*, 20-CR-20129 (S.D. Fla.) (ECF No. 58) (defendant pleaded guilty to violating 18 U.S.C. § 951 and was sentenced to 48 months' imprisonment for acting under the direction and control of a Russian government official to engage in surveillance

of a Russian defector); *United States v. Abouammo*, No. 19-CR-621 (N.D. Cal.) (ECF No. 426) (defendant convicted at trial on Section 951 charge and sentenced to 42 months' imprisonment for accessing, monitoring, and conveying confidential user information of anonymous Saudi dissidents held by Twitter in exchange for bribe payments from the Kingdom of Saudi Arabia and the Saudi Royal Family)[3] (ECF No. 426); *United States v. Doostdar*, No. 18-CR-255 (D.D.C.) (ECF No. 121.) (defendant pleaded guilty to conspiracy to act as an illegal foreign agent and acting as an illegal foreign agent and was sentenced to 38 months' imprisonment who traveled to the United States on behalf of the Iranian government and recruited a second individual to attend a rally in New York City protesting the Iranian regime); *United States v. Dumeisi*, No. 03-CR-664 (N.D. Ill.) (ECF No. 138.) (defendant convicted at trial of acting as an illegal foreign agent and conspiracy to act as an illegal foreign agent and sentenced to 46 months' imprisonment who was recruited by the Iraqi Intelligence Service to collect information regarding individuals and groups considered to be hostile to the Hussein regime).

Here, a sentence of 36 months' imprisonment would be proportionate to the sentences imposed in *Zhu*, *McMahon*, and *An*, where the defendant was a principal in opening and operating the Undeclared Police Station for the PRC's national police force in downtown Manhattan, and given the Undeclared Police Station's participation in transnational repression activities in targeting an Operation Fox Hunt victim located in California. Because of the defendant's assiduousness in deleting his messages with MPS Official-1—a trait shared by the defendants' coconspirators—the government has likely been unable to untangle the full extent of the Undeclared Police Station's pernicious harassment activities and its efforts to create a rival sovereign without the geographical confines of the United States.

---

[3] The Ninth Circuit subsequently vacated the sentence and remanded for resentencing based on an unrelated Guidelines calculation for Abouammo's other offenses of conviction. *See United States v. Abouammo*, No. 22-10348, 2024 WL 4972564 (9th Cir. Dec. 4, 2024).

13

V.      Conclusion

For the foregoing reasons, given the serious nature of the defendant's conduct and the threat to U.S. sovereignty posed by his actions, as well as to the victims who were harassed and surveilled because of the activity of the defendant and his co-conspirators – the government respectfully submits that a sentence of 36 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:     /s/
        Alexander A. Solomon
        Antoinette N. Rangel
        Assistant U.S. Attorneys
        (718) 254-7000

Enclosures

cc:     Clerk of Court (NRM) (by ECF and E-mail)
        Defense Counsel (by ECF and E-mail)