# EXHIBIT A

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                        22-CR-460(KAM)
3    UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5              -versus-                 March 19, 2025
                                        12:30 p.m.
6    QUANZHONG AN,

7              Defendant.

8    ------------------------------x

9            TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
                BEFORE THE HONORABLE KIYO A. MATSUMOTO
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES
     For the Government:      UNITED STATES ATTORNEY'S OFFICE
12                            Eastern District of New York
                              271 Cadman Plaza East
13                            Brooklyn, New York 11201
                              BY:  ALEXANDER SOLOMON, ESQ.
14                                 ANTOINETTE RANGEL, ESQ.
                                   MEREDITH ARFA, ESQ.
15                                 CLAIRE KEDESHIAN, ESQ.
                              Assistant United States Attorneys
16
     For the Defendant:       BRAFMAN & ASSOCIATES
17                            256 Fifth Avenue
                              New York, New York 10001
18                            BY:  BENJAMIN BRAFMAN, ESQ.
                                   JACOB KAPLAN, ESQ.
19
     Also Present:            JASON MORITZ, FBI Special Agent
20                            NANCY WU, Mandarin Interpreter
                              SHIN FENG, Mandarin Interpreter
21

22   Court Reporter:          Rivka Teich, CSR, RPR, RMR, FCRR
                              Phone:  718-613-2268
23                            Email:  RivkaTeich@gmail.com

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
25

1                        (In open court.)

2               THE COURTROOM DEPUTY:  All rise.  Criminal cause for

3     a sentencing, docket 22-CR-460, United States vs. Quanzhong

4     An.

5               Will the Government's attorney, please, state your

6     appearances.

7               MR. SOLOMON:  Good afternoon, your Honor.  Alex

8     Solomon, Antoinette Rangel, Meredith Arfa, Claire Kedeshian.

9     And joined by Special Agent Jason Moritz of the FBI.

10              THE COURT:  Good afternoon.

11              THE COURTROOM DEPUTY:  On behalf of Mr. An.

12              MR. BRAFMAN:  Good afternoon, your Honor.  Benjamin

13    Brafman.  I'm joined at counsel table by Jacob Kaplan.  And

14    Mr. An is present in court and ready for sentencing.

15              THE COURT:  Thank you.  We have present today a

16    Chinese interpreter.  Your name?

17              THE INTERPRETER:  Nancy Wu, W-U.  Good afternoon,

18    your Honor.

19              THE COURT:  Please take an oath.

20              (Interpreter sworn.)

21              THE INTERPRETER:  Yes, I do.

22              THE COURTROOM DEPUTY:  May I have Mr. An take an

23    oath.

24              Raise your right hand.

25              (Defendant sworn.)

1          THE DEFENDANT:  Yes.

2          THE COURT:  We have another interpreter.  State your

3    name.

4          THE INTERPRETER:  My name in Shin Feng.

5          THE COURT:  Take an oath to interpret these

6    proceedings.

7          (Interpreter sworn.)

8          THE INTERPRETER:  Yes, I do.

9          THE COURT:  Thank you.

10         Mr. An, do you understand that because you have

11   taken an oath to tell the truth, your answers to my questions

12   will be subject to the penalty of perjury or making false

13   statements if you do not answer truthfully?

14         THE DEFENDANT:  Understood.

15         THE COURT:  As you can see, we have a court reporter

16   here who is making a transcript of today's proceedings, if you

17   choose to exercise your appellate rights.

18         I'd like to address first the amended plea agreement

19   that has been proposed by the parties.  You may recall,

20   Mr. An, on May 28, 2024 you entered a plea of guilty to Count

21   Two before United States District Judge Pamela Chen, and that

22   was Count Two of the Superseding Indictment.  That charge

23   involved an accusation that you were acting as an agent of a

24   foreign Government in violation of 18 U.S. Code Section

25   951(a).

1          The Government has since entered into an addendum to

2   the plea agreement that modifies the total amount that you

3   have agreed to pay in forfeiture and adds a restitution order

4   in a specific amount to three identified victims.

5          Is that correct?

6          MS. RANGEL:  Yes, your Honor.  While the addendum to

7   the plea agreement lists three victims, the restitution amount

8   will only be paid to two victims as per your Honor's

9   restitution order.

10          THE COURT:  Understood.

11          The reason that is the case is because victim number

12   two, John Doe Two, has been paying the expenses associated and

13   incurred by John Doe One, correct?

14          MS. RANGEL:  That's correct, your Honor.

15          THE COURT:  Let me ask you, have you victims been

16   given notice of today's proceedings.

17          MS. RANGEL:  Yes, your Honor.

18          THE COURT:  Are any of them here today?

19          MS. RANGEL:  They are not because -- we'll talk

20   about that in sentencing.

21          THE COURT:  Let me say that I have received a letter

22   from John Doe Two which describes the terror that his family

23   experienced as a result of Mr. An's conduct, and in some

24   measure Ms. An's conduct as well.  And how their lives have

25   been upended, frankly, by the conduct.

1          Has Mr. Brafman been able to share the letter of

2    John Doe Two with his client?

3          MR. BRAFMAN:  Yes, your Honor.

4          THE COURT:  Have you had it translated for his

5    benefit?

6          MR. BRAFMAN:  Yes, your Honor.

7          THE COURT:  Has he been able to appreciate the

8    concern that John Doe Two expressed in his letter?

9          MR. BRAFMAN:  He has, your Honor.  I would note, the

10   date of the letter is while Mr. Anello, who is John Doe Two's

11   lawyer, was in serious negotiations with our office as to what

12   the amount of the restitution should be.  But I do not suggest

13   that the victim impact letters are in any way wrong about what

14   he claims to have experienced.

15         THE COURT:  Just to back up, since this is being

16   aired.  Mr. Anello, on behalf of the victims, wrote a letter

17   asking me to void the plea agreement based on those victims'

18   view that they had been completely forgotten and cut out of

19   the plea negotiations and the decision to get pleas of guilty

20   from Mr. An and Ms. An.  And he has since written a letter

21   that those concerns have been addressed.

22         It doesn't negate whatever John Doe Two and his

23   family suffered as a result of Mr. An's conduct.  Rather, it

24   describes for the Court the harm that they suffered and gives

25   some understanding as to the restitution amount and order.

1          So I just wanted to make sure Mr. An understands

2   that his conduct as described in Count Two was not without

3   consequence.

4          MR. BRAFMAN:  He understands that, your Honor.

5          THE COURT:  All right.  Did you want to be heard on

6   this point Mr. Solomon or Ms. Rangel?  I was very disturbed to

7   read that the victims had been forgotten in the plea

8   negotiations.  You have obligations, as you know, to your

9   victims.  And so I'm not doubting that you thought about your

10  victims, but Mr. Anello is a reputable lawyer and he was

11  concerned that his clients had not been adequately considered

12  in the Government's negotiations for the plea.

13         MR. SOLOMON:  Respectfully, your Honor, we did try

14  to keep the victims apprised of the plea negotiations and as

15  to the substance of the plea negotiations.  I think

16  Mr. Anello's initial letter to the court reflected

17  miscommunication.  We've since cleared up those issues.

18         THE COURT:  All right.  I'm going to ask you to

19  plead pursuant to the amended plea agreement.  But before I

20  accept your plea to the amended plea agreement, there will be

21  questions that I will ask you in order to assure myself that

22  your plea is valid.  If you don't understand my questions or

23  if you need clarification, or if you need to consult with your

24  lawyer please let me know.  All right, sir?

25         THE DEFENDANT:  Understood.

1          THE COURT:  Again, all of your responses are subject

2    to penalty of perjury or making false statements.  Sir, you've

3    taken an oath, I'll have you state for the record your full

4    legal name.

5          THE DEFENDANT:  Quanzhong An.

6          THE COURT:  Spell that, please?

7          THE DEFENDANT:  Q-U-A-N-Z-H-O-N-G, A-N.  Thank you,

8    sir.

9          THE COURT:  How old are you?

10          THE DEFENDANT:  Fifty-nine years old.

11          THE COURT:  What schooling or education have you

12    had, please?

13          THE DEFENDANT:  Masters degree, but I started

14    myself.

15          THE COURT:  So did you earn the Masters degree, you

16    actually have a Masters degree?

17          THE DEFENDANT:  Yes, I have.

18          THE COURT:  Have you had any difficulty

19    understanding the nature of the charges, these proceedings, or

20    the sentencing submissions with the assistance of an

21    interpreter, sir?  Have you had any difficulty understanding

22    any of this?

23          THE DEFENDANT:  I understand everything.

24          THE COURT:  Mr. Brafman, have you been able to

25    communicate with the assistance of an interpreter about the

1  charges, Mr. An's rights, the penalties that he would face

2  with a guilty plea, and the sentencing submissions?

3          MR. BRAFMAN:  Yes, your Honor.

4          THE COURT:  Mr. An -- you can remain seated,

5  Mr. Brafman, thank you.

6          Mr. An, are you presently or have you recently been

7  under the care of any physician or psychiatrist?

8          THE DEFENDANT:  Yes, I did see a physician.

9          THE COURT:  Sir, I have read your sentencing

10  submission and I understand that you do have some fairly

11  concerning medical conditions that you are taking medications.

12  There is perhaps recommended treatment or monitoring that your

13  doctors have described.  But may I ask, in the past 24 hours

14  have you taken any medicine or pills, had any alcoholic

15  beverages or consumed any narcotic drugs?

16          THE DEFENDANT:  No, no alcoholic drinks.

17          THE COURT:  Have you taken medicine, sir?

18          THE DEFENDANT:  No, not today.

19          THE COURT:  Do you feel that your mind is clear now?

20          THE DEFENDANT:  Yes, my mind is clear.

21          THE COURT:  Have you been hospitalized recently or

22  treated for any mental or emotional issues or any alcohol or

23  drug related issues?

24          THE DEFENDANT:  No.

25          THE COURT:  Mr. Brafman, have you discussed the

1   matter of pleading to an amended plea with your client?

2           MR. BRAFMAN:  Yes, your Honor.

3           THE COURT:  Does he understand the rights he would

4   be waiving if he does enter into this amended plea agreement?

5           MR. BRAFMAN:  Yes, your Honor.

6           THE COURT:  Do you believe he's capable of

7   understanding the nature of the proceedings we're holding now?

8           MR. BRAFMAN:  Yes, your Honor.

9           THE COURT:  Do you have any doubt as to whether or

10  not he's competent to plead?

11          MR. BRAFMAN:  None whatsoever.

12          THE COURT:  Have you reviewed with your client the

13  minimum and maximum sentence and fine restitution and

14  forfeiture that he faces if he does plead guilty pursuant to

15  this amended plea agreement?

16          MR. BRAFMAN:  Either I have or Mr. Kaplan has.  He

17  has been fully briefed on what we're doing today.

18          THE COURT:  All right.  Mr. An, as you know you have

19  a right to counsel.  Mr. Brafman and Mr. Kaplan have

20  represented you.  I ask you, are you satisfied with their

21  representations, sir?

22          THE DEFENDANT:  I'm satisfied.

23          THE COURT:  Have you received a copy of the amended

24  plea and the Superseding Indictment in this case?  The

25  Superseding Indictment are the charges and the amended plea

1   agreement is what your --

2               THE DEFENDANT:  Yes, I understand.  I did.

3               THE COURT:  He received copies?

4               THE DEFENDANT:  Yes.

5               THE COURT:  Did you review those documents with your

6   lawyer, sir?

7               THE DEFENDANT:  I have read it.

8               THE COURT:  Did you review those documents with your

9   lawyer?

10              THE DEFENDANT:  Yes.

11              THE COURT:  Sir, when you entered a plea of guilty

12  before Judge Chen to Count Two of the Superseding Indictment

13  on May 28, 2024, you were advised that you had the right not

14  to plead guilty.  And I advise you again that with regard to

15  this amended -- you've already pled guilty, and we've accepted

16  your guilty plea, but you are intending, I believe, to plead

17  guilty and add another penalty, specifically restitution.  Do

18  you understand?

19              THE DEFENDANT:  I do understand.

20              THE COURT:  By pleading guilty back in May you gave

21  up your right to proceed to a trial as to whether or not you

22  were guilty of Count Two of the Superseding Indictment.  Do

23  you understand?

24              THE DEFENDANT:  Yes.

25              THE COURT:  In pleading guilty in May of 2024 you

1   also gave up the presumption of innocence with regard to Count

2   Two of the Superseding Indictment.  Do you understand?

3                   THE DEFENDANT:  Yes.

4                   THE COURT:  You also relieve the Government of its

5   obligation to prove beyond a reasonable doubt every element of

6   the offense to which you pled guilty.  Do you understand?

7                   THE DEFENDANT:  I understand that.

8                   THE COURT:  So giving up your right to put the

9   Government to its proof at a trial, you gave up your right to

10  object to any evidence the Government may offer against you,

11  and you gave up your right to cross-examine any witnesses that

12  the Government may have called to establish your guilt beyond

13  a reasonable doubt.  In other words, you are substituting your

14  own guilty plea for the Government's burden to prove you

15  guilty beyond a reasonable doubt.  Do you understand?

16                  THE DEFENDANT:  Yes, I gave up the right.

17                  THE COURT:  By pleading guilty, sir, you also gave

18  up your right against self-incrimination.  As you were advised

19  at your guilty plea, the United States constitution protects

20  your right not to incriminate yourself.  But because you pled

21  guilty, you gave up that right and admitted your guilt to the

22  charges set forth in Count Two of the Superseding Indictment.

23  Do you understand?

24                  THE DEFENDANT:  I understand that that's for Count

25  Two charge.

1        THE COURT:  All right.  So if you standby your prior

2   guilty plea but also agree to amend your plea to include an

3   obligation to pay restitution to your victims, you are

4   admitting, one, that there were victims of your offense; two,

5   that those victims suffered losses; and three, that you're

6   responsible for compensating those victims for those losses.

7   Do you understand?

8        (Discussion was had off the record.)

9        MR. BRAFMAN:  Mr. An has agreed to pay restitution

10  for the loss that they claim to have suffered.  But he does

11  not have to agree that he personally caused the loss.  It's a

12  distinction with a difference in his mind.

13        THE COURT:  Well, restitution may be awarded in

14  favor of a victim who suffered losses as a direct result of a

15  defendant's criminal conduct.  Is he disavowing that?

16        MR. BRAFMAN:  I'm sorry?

17        THE COURT:  Is he disavowing that the victims who

18  have been identified by the Government suffered losses that

19  were caused by Mr. An's criminal conduct with regard to Count

20  Two?

21        MR. BRAFMAN:  No, he is not.  He is claiming,

22  however, that the losses that they suffered were partially the

23  result of the Chinese Government; and yet, he, as the agent

24  who failed to register, was involved in the process.

25        THE COURT:  So he's saying that he shares blame with

1    the Chinese Government?

2             MR. BRAFMAN:  Yes, your Honor.

3             THE COURT:  For the losses?

4             MR. BRAFMAN:  Yes.

5             THE COURT:  All right.  I guess the point is -- he

6    wanted to say something else.

7             (Discussion was had off the record.)

8             MR. BRAFMAN:  Your Honor, he is only troubled by the

9    fact that he has agreed to accept the representation as to the

10   specific losses that John Doe One or Two had claimed to have

11   suffered.  And he accepts that.  And he has agreed to pay

12   restitution.  He did not know specifics of what they now claim

13   that they have suffered.

14            THE COURT:  I thought that you reviewed the letter.

15            MR. BRAFMAN:  We did, we did.  He is accepting that

16   representation.  He is not accepting responsibility for

17   knowledge of each of those losses at the time they were

18   incurred.  I think that's what he is troubled by.

19            THE COURT:  Okay.  I'm not asking him to admit that

20   he knew that each loss as it was incurred, that he was aware

21   of that.  But the restitution statute requires that there be a

22   causal connection between a defendant's actions, the criminal

23   conduct, and a loss suffered by a victim.

24            MR. BRAFMAN:  Yes.

25            THE COURT:  So is he willing to admit that his

1  conduct caused the losses that the victims claim to have

2  suffered as a result of his acting as an agent of a foreign

3  Government?

4         MR. BRAFMAN:  Yes.  Yes, I think he's accepting

5  that.

6         THE COURT:  Rather than have you speak for him -- I

7  think Mr. An looks like he's not agreeing with you,

8  Mr. Brafman.

9         (Discussion was had off the record.)

10         MR. KAPLAN:  If I can clarify.

11         THE COURT:  I'd like to hear from Mr. An, but go

12  ahead Mr. Kaplan.

13         MR. KAPLAN:  I'll lay the ground work then hear from

14  Mr. An.

15         Mr. An pleaded guilty to the 951 charge, which is

16  the acting as an agent of a foreign Government.  As part of

17  our submission we put forth the argument that Mr. An was not

18  intending to harass or annoy or do anything towards the

19  family, but rather he's guilty on acting as an intermediary on

20  behalf of the Chinese Government.

21         As part of the restitution order under the plea

22  addendum, we believe under 18 U.S.C. 3663(a)(3), that the

23  Court can order restitution as agreed to by the parties in the

24  plea agreement.  It does not require Mr. An to acknowledge or

25  agree that they are being paid restitution as victims of his

1  crime, because the crime he's pled guilty to, the 951, which

2  is a notice issue, and the defense does not believe they are

3  victims of that crime.

4           THE COURT:  Well, I think the law says there can be

5  victims associated with the offense.  And here there is quite

6  a bit of evidence that there were victims associated with this

7  offense.  By acting as an agent of the PRC he was approaching

8  people living lawfully in the United States, including a U.S.

9  citizen, and exerting pressure that was communicated or that

10 was originated from the PRC to have one of those individuals

11 return to China.

12          I'm not making any judgment about whether that

13 individual is guilty of any offense.  I'm just saying in

14 connection and closely intertwined, in fact inextricably

15 intertwined with his action as an agent for the PRC operating

16 in this country, pressure was exerted on an individual whom

17 the PRC wanted to be returned to China.  And that pressure was

18 applied directly by Mr. An.  And was also exerted on that

19 individual's son and I believe daughter.  But he himself,

20 Mr. An himself, did exert that pressure while acting as an

21 agent for the PRC, the Government.

22          Do you have a different view of the evidence in this

23 case?  Am I missing something?

24          MS. RANGEL:  No, I don't think you're missing

25 anything, your Honor.  I think what Mr. Kaplan, I think, is

1    trying to say with respect to restitution is that the

2    Government and defense counsel have different views of the 951

3    conduct.  And the way we were able to come to an agreement

4    with respect to restitution under that particular provision is

5    where Mr. An doesn't have to agree to the conduct with respect

6    to 951, but instead as part of his plea agreement can agree to

7    pay restitution for losses suffered by impacted parties.

8              THE COURT:  Well, those losses were suffered because

9    of the conduct of the defendant who is agreeing to pay the

10   restitution.

11             For example, he wouldn't, and no defendant would,

12   just agree to pay restitution to any random person because

13   they suffered a loss.  There has to be a connection between

14   the conduct and the losses suffered by the individual;

15   otherwise, restitution doesn't make sense.  Right?

16             MS. RANGEL:  I think that what 3663(a)(3) allows

17   for, is restitution that is impacted by the conduct not

18   necessarily you have to call them victims.  Because obviously

19   in view of the Government, which we'll talk about in the

20   3553(a) factors, how these individuals are victims, defense

21   counsel views them differently but is willing to compensate

22   because they have been impacted by this case.

23             THE COURT:  They've been impacted by Mr. An's

24   conduct.  Is he agreeing to that?  Will he agree to that?

25             Mr. An, your conduct had an impact on the people

1   that the Government has identified as victims of your offense.

2   Do you agree that your actions --

3            (Discussion was had off the record.)

4            THE DEFENDANT:  This is the case.  The victims

5   requested to have court fees and expenses.  I have no idea

6   until the victim told me there is such cost so, you know, I do

7   not even know that.

8            THE COURT:  There is evidence, Mr. An, that you told

9   one of the victims that the PRC caused a lawsuit to be filed

10  in New York state court against the victims.  And that they

11  would keep litigating against those victims, even though I

12  believe you acknowledged that the lawsuit was frivolous.  But

13  they would stop at nothing.  They could keep litigating until

14  the victims were financially destroyed.  And they in their

15  victim impact statement, they write a letter saying that

16  defending themselves against this litigation caused great

17  financial harm to them.  Their moneys were depleted.

18           THE INTERPRETER:  I'm having difficulty hearing you.

19           THE COURT:  I'm sorry.

20           Basically what I said -- I think he heard me

21  actually.

22           (Discussion was had off the record.)

23           MR. BRAFMAN:  Your Honor, Mr. An is having trouble

24  understanding the fact that he did not know at the time that

25  they incurred these losses that they actually incurred these

1    losses.  He is willing to accept responsibility.  We can

2    address it later when we do the sentencing discussion, but

3    he's willing to accept responsibility that he has agreed to

4    pay restitution based on their representation to the Court

5    through their lawyer that these are losses that they have

6    suffered.  He is not willing to acknowledge that he knew at

7    the time that they were incurring these expenses.

8              THE COURT:  I said that he doesn't have to admit

9    that he knew at the time that they were incurring expenses.

10   But when he had discussions with one of the victims about the

11   lawsuit, Mr. An told him that the lawsuit was frivolous, it

12   was started at the behest of the PRC, that the PRC would keep

13   litigating, it was a drop in a bucket.  Now, obviously Mr. An

14   knows that when one is sued they must generally hire a lawyer

15   and the lawyers don't work for free.  And the legal fees were

16   incurred.

17             I'm not asking him to admit that he knew at the time

18   that these fees were being incurred.  What I'm asking him, and

19   what I'm trying to convey, is that in determining whether to

20   order restitution I must consider the amount of the losses

21   sustained by each victim as a result of the offense of the

22   defendant.  And we define victims, a person directly or

23   proximately harmed as a result of the commission of an offense

24   for which restitution may be ordered.  So here the offense was

25   acting as a foreign agent.  And what I'm trying to understand

1   from Mr. An is that he acknowledged that the victims, who are

2   the subject of the restitution order, suffered harm that was

3   directly and proximately caused by his conduct.  Does he admit

4   that?

5            (Discussion was had off the record.)

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Maybe we should adjourn this and maybe I

2     should take the other sentencing because it seems like there's

3     a lot of issues here that haven't been resolved.  I don't want

4     to waste any more time.  We've been waiting here for a long

5     time.

6          Let's go forward.

7          MS. RANGEL:    With this sentencing?

8          THE COURT:  We can take the other sentencing now.

9          MS. RANGEL:  Or perhaps --

10         THE COURT:  Because Mr. An needs to have further

11    discussions with his lawyer.  I don't see the point in all of

12    us sitting here waiting for him to have these discussions.  I

13    want him to take as much time as he wants but he's not ready

14    to be sentenced or to plead to his obligation to pay

15    restitution.

16         The statute under which you are proceeding to award

17    restitution does direct that I consider the amount of the loss

18    sustained by victims of the offense and to determine whether

19    these victims are persons who are directly and proximately

20    harmed as a result of the commission of the offense which is,

21    you know, operating as an agent of a foreign government in our

22    country.

23         So I'm not quite sure what's in controversy here,

24    but it doesn't seem that he wants to acknowledge that his

25    offenses caused harm to the victims.  And I would feel that if

1    I'm going to allow him to amend his plea and pay restitution,

2    he needs to acknowledge that these are victims who are

3    entitled to restitution because they did suffer direct and

4    proximate harm from his criminal conduct.

5             I just think we've been going around and around and

6    I think we should just get to the other sentencing because I

7    don't anticipate there's going to be all of this disagreement.

8    He doesn't have to agree to anything, we can have a hearing if

9    he wants, but I'd like to not keep going with this if he can,

10   if he doesn't want to.  I'm not going force him to do

11   anything.

12             MS. RANGEL:  Of course, your Honor.

13             THE COURT:  The victims do have rights, all right?

14   They have rights.  So whether this means we follow through

15   with Mr. Anello's original request or not I think we should

16   move forward at this point.  All right?  Does anyone mind?  I

17   want Mr. An to know he doesn't have to agree to anything that

18   he doesn't want to agree to and I don't want to keep having

19   this debate back and forth.

20             Is Ms. Wong in the courtroom?  Can we proceed?

21             MS. HARRIS:  She is, your Honor.  One of the lawyers

22   on the team is coming at 2:30.  Can we take a 5- or 10-minute

23   recess so we can pivot and I can make a phone call.

24             THE COURT:  Yes.  Well, let me make sure.

25             Mr. Brafman I think that's the best way to proceed,

1   don't you think?  Given your client's hesitation to admit

2   there were victims associated with his offense who were harmed

3   proximately  by his conduct which is something that I think

4   the statute directs me to consider.

5            MR. BRAFMAN:  Can we just have another two minutes,

6   Judge?  I think we're making progress but it's difficult

7   because I'm working through an interpreter.

8            THE COURT:  But, Mr. An, you must understand I'm not

9   requiring you to admit to anything you don't want to admit to,

10  all right?  I just have to make sure that the statute that

11  allows me to award restitution tells me to consider certain

12  factors.  And I'm just making sure that I'm carefully

13  complying with that statute.  So I think, in the interest of

14  time it might make sense to proceed with Ms. Guangyang  An's

15  sentencing at this time.  All right, sir?

16           I don't want you to have to feel that you're being

17  pressured and I'm sorry if you didn't understand what the law

18  requires me to inquire.  All right?

19           Did you want five  more minutes, Mr. Brafman?

20           MR. BRAFMAN:  Yes, your Honor.

21           THE COURT:  All right.

22           (A brief pause in the proceedings was held.)

23           MR. BRAFMAN:   Your Honor, I think we are ready to

24  proceed.

25           THE COURT:  All right.

1          MR. BRAFMAN:  Your Honor, if the Court could simply

2     phrase the question that by him characterizing knowledge that

3     the lawsuit was frivolous, in his mind at the time, he

4     understood that they were defending a frivolous lawsuit that

5     was brought by the Chinese government in a sense to attempt to

6     pressure him.  Mr. An did not do that because he conveyed the

7     information that he knew that the lawsuit was frivolous.

8          THE COURT:  He can make that statement if that's his

9     statement.

10          MR. BRAFMAN:  Yes, your Honor.  So he accepts

11     responsibility.

12          THE COURT:  Let me hear it from him because every

13     time you say something and the interpreter translates it, or

14     Mr. Kaplan says something, Mr. An looks like he doesn't agree

15     with you.  So I would like him to make the statement.

16          Go ahead, Mr. An, I'm happy to hear from you.

17          THE DEFENDANT:  He told me that what's going on in

18     the Court with the Chinese government.  And I did not know

19     prior to his telling me of that.  And I did say it him, you

20     know, it's frivolous and it's the Chinese government giving

21     you pressure.  Yeah, they keep suing you that way.  So it's

22     him who told me that before.  I did not know that.

23          I admit that what I say may give him pressure.  May

24     in a sense that he feel pressure from the Chinese government

25     as well.  But I am willing to pay the restitution but I want

1    the facts be known.

2          THE COURT:  All right.  My concern was that I wanted

3    to be sure that the restitution that I will be imposing as

4    agreed to by you to and the Government is going to be

5    compensating the people that have been identified as victims

6    because they've suffered harm as a result of your conduct in

7    this case.

8          Are you willing to admit that they are entitled to

9    restitution because they suffered harm as a result of your

10   conduct, sir?

11         THE DEFENDANT:  I agree.  I agree.

12         THE COURT:  All right.  So, just to be clear, if I

13   accept your amended plea, which adds restitution, you are not

14   going to  be contesting the amount of the restitution or the

15   victims' entitlement to restitution; is that correct?

16         THE DEFENDANT:  I agree to that.

17         THE COURT:  All right.  Now, in the process of

18   pleading guilty previously, and as you intend to do today, if

19   you do plead guilty, you are giving up your right to ask the

20   Court of Appeals to review the legality of all of the

21   proceedings leading up to your conviction, that is, your

22   guilty plea and the restitution order.

23         Do you understand?

24         THE DEFENDANT:  Yes, I understand that with regard

25   to the plea.

1          THE COURT:  All right.  And I wanted to just circle

2     back to the original plea agreement and the amended plea

3     agreement in which you agreed to  pay forfeiture of a certain

4     amount.  The amended plea agreement provides that that amount

5     you are going to pay in forfeiture is now delegated in part to

6     forfeiture and in part to restitution, correct?

7          THE DEFENDANT:  Yes, I agree and I already make

8     those payments, in fact.

9          THE COURT:  Mr. Brafman, can you confirm that Mr

10    . An has paid both his forfeiture and the restitution

11    payments?

12         MR. BRAFMAN:  Yes, your Honor.

13         Those payments were made shortly after his initial

14    plea and they've been sitting in my escrow account for almost

15    a year waiting for the Government and counsel to agree on the

16    bottom line.

17         THE COURT:   So you represented in a letter to me

18    that you would bring the checks to court here?

19         MR. BRAFMAN:  I am and I am going to hand them over

20    to Clare Kedeshian .

21         THE COURT:  For the forfeiture?

22         MR. BRAFMAN:  Yes.

23         THE COURT:  Are you allowed to take checks directly

24    from -- I thought the internal controls would not allow you to

25    do that.  But if you can take the forfeiture, that's fine.

1    The restitution can be paid at the clerk's office.

2             MS. KEDESHIAN:  I think we'll accommodate that for

3    today, Judge.  And I will make sure that I will deliver it

4    within our office and it's processed accordingly.

5             Thank you.

6             THE COURT:  So, Mr. An, we talked about this before,

7    at least you had this discussion with Judge Chen, that when

8    you are enter  a guilty plea you are basically giving up your

9    right to bring an appeal as to your guilt, an appeal as to the

10   restitution and forfeiture, and you are giving up your right

11   to go to trial and have the Government prove your guilt beyond

12   a reasonable doubt and its entitlement to forfeiture and

13   restitution.

14            Do you understand?

15            THE DEFENDANT:  Yes, I agree.

16            THE COURT:  Now, do you intend to maintain your

17   guilty plea to Count Two of the superseding indictment as

18   entered before Judge Chen?

19            THE DEFENDANT:  Yes.

20            THE COURT:  On that date, you pled guilty on May

21    28, 2024, to Count Two of the superseding indictment which

22   charged you with acting as an agent of a foreign government in

23   violation of 18, United States Code, Section 951.

24            At your plea hearing before Judge Chen, the

25   Government set forth the elements that it would have to prove

1    beyond a reasonable doubt.  You are standing by that plea, so

2    therefore, you have agreed that you, first of all, acted as an

3    agent of a foreign government or official, specifically, the

4    People's Republic of China; that,

5              Second, you failed to notify the Attorney General of

6    the United States that you would be acting as a agent of a

7    foreign government in the United States before you started to

8    so act;

9              Third, you acted as an foreign agent knowingly; and,

10             Fourth, you acted at least in part as an agent for

11   the Government or as an official of the PRC while in the

12   United States.  You had pled guilty to those elements and

13   before Judge Chen, you described your conduct which led her to

14   conclude that you had you satisfied through your guilty plea

15   the elements of the offense.

16             Now, as I said, the addendum clarifies the prior

17   agreement to pay a forfeiture and also adds in the amendment

18   that you will pay restitution to the victims.  Paragraphs

19    1(e) and 6 through 14 of the addendum to the plea agreement

20   state those changes and amend in their entirety the same

21   paragraphs in the plea agreement that you signed on May 24,

22   2024.  On May 24, 2024, you consented to forfeiture seized

23   property and money which included a sum of $5 million.

24             In the addendum to the plea agreement, you are

25   agreeing that under 18, United States Code,

1    Section 3663(a)(3), the Court should order restitution in the

2    amount of $ 1,276,018 to the victims John Doe 1, John Doe 2,

3    and Jane Doe 1 and order forfeiture in the amount of

4    $3,723,982.

5              Do you agree to that, sir?

6              THE DEFENDANT:  I agree.

7              THE COURT:  Do you further agree that the forfeiture

8    amount of $3,723,982 will consist of seized assets identified

9    in the addendum to the plea agreement as well as the remainder

10   balance for the forfeiture in the amount of $945,340.73 that

11   must be paid in full as of the date of your sentencing.

12             Your lawyer has promised to deliver a check to the

13   Forfeiture Unit of the United States Attorney's Office today

14   in that amount.

15             Do you understand and agree?

16             THE DEFENDANT:  Yes, I agree.  But they've already

17   been fully paid.

18             THE COURT:  Well, it's not paid until it's in the

19   hands of the United States.  Mr. Brafman is going to deliver

20   the checks.

21             MR. BRAFMAN:  Yes.

22             THE COURT:  I understand your point.

23             You, yourself, have written those checks but the

24   checks have not yet been transmitted to  the United States.

25   At that point, it will be deemed paid and you will receive a

1    receipt.

2              THE DEFENDANT:  Yes, I understand that.

3              THE COURT:  Does he understand the procedures or has

4    any of this been explained to him because he seems to be not

5    understanding the procedures.

6              Mr. Kaplan or Mr. Brafman?

7              MR. BRAFMAN:  I think he understands, Judge.  I'm

8    just sorry that we're working this hard through an

9    interpreter.

10             I apologize, Judge.

11             THE COURT:  It's not because of the interpreter.

12             MR. BRAFMAN:  No, I understand that.

13             THE COURT:  I think Mr. An didn't fully the

14   understand the logistics of all of this.

15             Mr. An, have you reviewed the addendum to the plea

16   agreement with your lawyer?

17             THE DEFENDANT:  Yes, I read it.  I agreed to it.

18             THE COURT:  All right.  The penalties that you

19   facing are the same as they were with regard to the

20   incarceration part of the penalties.  The maximum term of

21   imprisonment that can be imposed on Count Two is ten years.

22   There is no minimum term of imprisonment.  Any term of

23   imprisonment can be followed by a term of supervised release

24   of up to three years and supervised release is a time during

25   which you are under the supervision of the Court through the

1    probation department.

2            There will be conditions associated with supervised

3    release that you will have to follow and if you don't abide or

4    comply with those conditions of supervised release, you can be

5    found to be in violation and you could be returned to prison

6    without a trial for all or part of the remainder of your

7    supervised release term that will not exceed two years and

8    without credit for time that you may have already spent in

9    prison and I acknowledge you already spent seven difficult

10   months in prison.

11           Do you understand?

12           THE DEFENDANT:  Yes.

13           THE COURT:  You also face a possible maximum fine of

14   either $ 250,000 or twice the gross gain or loss caused by the

15   offense to which you are pleading guilty.

16           Do you understand?

17           THE DEFENDANT:  Yes.

18           THE COURT:  In addition, I must impose a mandatory

19   special assessment under 18, United States Code, Section 3013

20   in the amount of $100.

21           Do you understand?

22           THE DEFENDANT:  Yes.

23           THE COURT:  And one aspect that was covered

24   previously but I am going to remind you that because you have

25   pled guilty to Count Two, and you are affirming that guilty

1  plea and agreeing to pay restitution, you do face removal or

2  deportation from the United States as a consequence of your

3  guilty plea.  And you previously recognized that possibility

4  in Paragraph  15 of your plea agreement; that provision has

5  not been modified.

6           Do you understand?

7           THE DEFENDANT:  Yes.

8           THE COURT:  And, sir, despite the fact that you

9  could be deported or removed from the United States, do you

10  still intend to maintain your previous guilty plea to Count

11  Two of the superseding indictment?

12           THE DEFENDANT:  Yes.

13           THE COURT:  And you will agree to amend your prior

14  plea regardless of any immigration consequences that are

15  likely to flow from your prior guilty plea.

16           Do you understand?

17           THE DEFENDANT:  Yes.

18           THE COURT:  I am not the judge who decides your

19  immigration status in this country, that's a separate

20  proceeding, and I have no control or advice in that process.

21           Do you understand?

22           THE DEFENDANT:  Yes.

23           THE COURT:  All right.

24           Now, we talked about this earlier at your plea

25  hearing before Judge Chen that the Sentencing Reform Act of

1  1984 has authorized the United States Sentencing Commission to

2  issue guidelines for judges to consult in a criminal case.

3          The United States Supreme Court has decided those

4  guidelines are not mandatory but rather advisory.  I have, as

5  I must, consult those guidelines which provide a range of

6  sentence within the minimum of zero and maximum sentence under

7  the law and I must also consider the factors set forth at 18,

8  United States Code, Section 3553(a).

9          Do you understand?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Now, in your particular case, given the

12  offense that  you pled guilty to, there are no applicable

13  sentencing guidelines for the offense in Count Two.  So I am

14  directed, instead, to consider the factors set forth in the

15  criminal code at 18, United States Code, Section 3553(a).

16          Do you understand?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Those factors include the nature and

19  circumstances of your offense.  They include whether or not it

20  gives me -- also obligates me to consider relevant conduct

21  associated around your offense.  I also must consider your

22  background information, your education, your employment

23  history, any prior criminal history, and I understand there is

24  no prior criminal history.  Military service, family

25  circumstances, et cetera.  And all of those factors will be

1    considered and have been considered as I'm about to impose

2    sentence.

3              Do you understand?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Now, Mr. Brafman  or Mr. Kaplan, I am

6    assuming that you have discussed the advisory sentencing

7    guidelines with your client and that he understands the range

8    of sentence that he faces; is that correct?

9              MR. BRAFMAN:  There are no applicable guidelines.

10             THE COURT:  Right.  But we still came up with some

11   of the guidelines for his supervised release.

12             MR. BRAFMAN:  Yes.

13             THE COURT:  Right.  Okay.  And he understands those,

14   sir?

15             MR. BRAFMAN:  Yes.

16             THE COURT:  All right.  And Paragraph 4 of your

17   original and the amended plea agreement states that you are --

18             Ms. Rangel, do you have something to say?

19             MS. RANGEL:  No, I am just listening intently.

20             THE COURT:  You looked  concerned, okay.  I just

21   wanted to make sure I didn't say something.  All right.

22             Now, I have considered the guidelines and the

23   statute in determining your sentence.  In Paragraph 4 of your

24   agreement, you agreed not to file an appeal or challenge your

25   sentence if I impose a term of imprisonment of 120 months  or

1  less.  In other words, ten years or less.

2          Do you understand that you have given up your right

3  to bring an appeal of a sentence or ten years or less?

4          THE DEFENDANT:  Yes.

5          THE COURT:  And again, sir, in the federal system,

6  parole has been abolished.  So if you are sentenced back to

7  prison, you will not be released on parole.

8          Do you understand?

9          You will not be released early on parole.

10          Do you understand.

11          THE DEFENDANT:  I understand.

12          THE COURT:  All right.  Do you have any questions

13  you would like to ask me or your lawyers about your rights or

14  about anything else relating to this proceeding that we are

15  holding right now?

16          THE DEFENDANT:  No.

17          THE COURT:  Do you stand by your prior guilty plea

18  to Count Two that you entered on May 28, 2024?

19          Do you stand by that guilty plea, sir?

20          THE DEFENDANT:  Yes.

21          THE COURT:  And did you enter that guilty plea

22  voluntarily and of your own free will?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Did anyone threaten you or pressure you

25  to plead guilty?

1          THE DEFENDANT:  No.

2          THE COURT:  Other than the plea agreement that you

3    made with the Government including the amended plea agreement,

4    did anyone make any promise to you that caused you to plead

5    guilty?

6          THE DEFENDANT:  No.

7          THE COURT:  And do you understand that any

8    recommendation of the sentence agreed to by your counsel and

9    the prosecution is not binding on this court.

10          Do you understand?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Did anyone make any promise to you about

13    what your sentence will be?

14          THE DEFENDANT:  No.

15          THE COURT:  Mr. An, knowing of all the possible

16    consequences of your plea including the sentence exposure that

17    you have in prison, your exposure on supervised release, your

18    exposure to pay forfeiture, restitution, a special assessment,

19    and possibly a fine do you wish to contest your plea that you

20    entered on May  28th of 2024?

21          THE DEFENDANT:  No.

22          THE COURT:  At your plea hearing on May  28, 2024,

23    you stated under oath that between January 2017 and October

24    2022 in New York City, Queens, you, at the direction of the

25    Chinese government, knowingly communicated messages from the

1  Chinese government to an individual in the United States

2  without prior notification to the Attorney General of the

3  United States.

4           Do you affirm that those statements were made and do

5  you stand by those statements under oath?

6           THE DEFENDANT:  Yes.

7           THE COURT:  I've reviewed the transcript of your

8  guilty plea before Judge Chen and confirmed as Judge Chen

9  previously determined that your plea of guilty was knowing and

10 voluntary and based upon a full understanding of your rights

11 and the consequences of your plea; and that there was a

12 factual basis for your plea of guilty to Count Two of the

13 superseding indictment.

14          Today, I also find that you are acting voluntarily

15 and that you fully understand your rights and the consequences

16 of your plea including the additional restitution obligation

17 and there is a factual basis for your plea.  And, therefore, I

18 accept accepted the amended plea agreement to Count Two of the

19 superseding indictment.

20          Is there anything else the parties would like me to

21 take care of with regard to this amended plea.

22          MS. RANGEL:  Your Honor, the Government would move

23 the addendum to the plea agreement into evidence and ask that

24 it be marked and we'll provide a scanned copy to the Court

25 after today's proceeding.

 1              THE COURT:  Certainly.  We'll mark it as Court

 2      Exhibit No. 1 and I will ask Mr. An whether he had this

 3      document translated and was able to discuss the terms of this

 4      document with his attorneys with the assistance of a

 5      translator.

 6              This is Court Exhibit 1.

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  My first question is would you identify

 9      your signature on the last page of this document, please.

10              This is the amended plea agreement.  Is that your

11      signature, sir?

12              THE DEFENDANT:  It is, yes.

13              THE COURT:  Before you signed this, did you have it

14      translated, sir?

15              Was it translated for you?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Did you have a chance to discuss all of

18      the terms of this agreement with your lawyers with the

19      assistance of a translator?

20              THE DEFENDANT:  Yes.

21              THE COURT:  And by signing this document, do you

22      intend to indicate that you understand the document and that

23      you agree to the terms?

24              THE DEFENDANT:  Yes, I agree.

25              THE COURT:  Thank you, sir.

1          MS. RANGEL:  Just for the record, your Honor, on the

2    signature page there is a signature of a translator.

3          THE COURT:  Yes.  It wasn't you.  I know that it

4    was -- I can't read the signature.  It was probably not you,

5    was it?  Did you translate this amended plea agreement?

6          INTERPRETER WU:  Yes, verbally, but that's not my

7    signature.  But I did verbally translate it today.

8          THE COURT:  All right.  Thank you.

9          THE INTERPRETER:  That is not mine either, your

10   Honor.

11         MR. KAPLAN:  We had a different interpreter but in

12   the abundance of caution we had Ms. Wu go through it.

13         THE COURT:  Was the interpreter court certified?

14         MR. KAPLAN:  No, that's why we went through it

15   today.

16         THE COURT:  That's a good idea.  Why doesn't she

17   sign it as well then, all right?  Have her sign it.  You can

18   sign it under the name of the other interpreter whose

19   signature I can't read.

20         THE INTERPRETER:  Yes.

21         THE COURT:  All right.  Now that I've accepted

22   Mr. An's guilty plea pursuant to the amended plea agreement, I

23   would remind him that you are still under oath and I would ask

24   if we are ready to proceed with his sentencing at this time.

25         MS. RANGEL:  Yes, your Honor.

1            THE COURT:  Mr. Brafman, are you ready?

2            MR. BRAFMAN:  Yes, your Honor.

3            THE COURT:  All right.  Now, the Government has

4   confirmed that the victims who submitted the victim impact

5   statement were given reasonable and timely notice of these

6   proceedings.  Mr. Solomon has already noted they are not here

7   today.  But Mr. Brafman has confirmed that he has had the

8   victim impact statement translated for Mr. An.

9            MR. BRAFMAN:  Yes, your Honor.

10            THE COURT:  And that you have discussed that victim

11   impact statement with him, am I correct?

12            MR. BRAFMAN:  Yes, your Honor.

13            THE COURT:  And that the victims have also approved

14   the restitution order  that the Government negotiated and has

15   made part of the amended plea agreement.

16            MR. SOLOMON:  Your Honor, I would note for the

17   record that counsel, Mr. Anello's partner, is here today.

18            THE COURT:  Does he wish to  be heard on behalf of

19   his clients?  Mr. -- what's his name?

20            MR. SOLOMON:  Mr. Weatherwax.

21            THE COURT:  Would you like to be heard or would you

22   like to read your client's letter or speak for them today.

23            MR. WEATHERWAX:  Thank you, your Honor.  I am here

24   as an observer.

25            THE COURT:  You are just observing.

1           MR. WEATHERWAX:  Yes.

2           THE COURT:  Does the Government wish to submit the

3   victim impact statement into the record or to have it read or

4   to have it publicized in any way?

5           MR. SOLOMON:  It was part of our sentencing

6   submission, your Honor.  I think, in the interest of time, we

7   would prefer not to have to read today.

8           THE COURT:  All right.  Well, in case the public is

9   interested in hearing from the victims, do you have any

10  objection to publishing it?

11          MR. SOLOMON:  No.

12          THE COURT:  As long as the names are redacted?

13          MR. SOLOMON:  Yes, as long as it's not an issue with

14  Mr. Weatherwax.

15          THE COURT:  Mr. Weatherwax, is there any objection?

16          MR. WEATHERWAX:  I think my clients would not be

17  comfortable with that.

18          THE COURT:  All right.  Well, you know, about the

19  presumption of transparency in the courts and I understand

20  that they probably would have concerns about their safety.

21  But I guess I would ask you to consider if you would -- if

22  they would be willing if their names were redacted from the

23  public record whether they would agree but I am not going to

24  push at this time on that issue.

25          MR. WEATHERWAX:  Okay, your Honor.  If I could have

1    some time to put together a letter in response?

2                    THE COURT:  Sure.  Thank you.

3                    We've already discussed that Mr. An is going to pay

4    $1,276,018 in restitution to John Doe 1, John Doe 2, and

5    Jane Doe 3.

6                    MS. RANGEL:  Jane Doe 1, your Honor.

7                    THE COURT:  Excuse me, thank you.

8                    Following the sentencing, I will enter the order of

9    restitution.  I think there was a small typo in the order and

10   the Government was going to submit a corrected order.  It was

11   just with regard to Jane Doe 1 but I will make that

12   restitution part of the judgment and it doesn't appear that

13   anyone objects, correct?

14                   MS. RANGEL:  That's correct, your Honor.

15                   THE COURT:  And Mr. Brafman, again, has confirmed

16   that he is prepared to pay the full amount of restitution and

17   the forfeiture today.

18                   In preparation for Mr. An's sentencing, I reviewed

19   the superseding indictment; the preliminary order of

20   forfeiture; the original agreement; the addendum to the plea

21   agreement; the Government's submissions regarding victim

22   notification; the parties' submissions regarding forfeiture

23   and restitution.

24                   The probation department's presentence investigation

25   report; the sentencing recommendation by Probation, both dated

1    December 10, 2024.  The probation department's first addendum

2    to the presentence report dated March 3, 2025.  The probation

3    department's second addendum dated March 4, 2025, and the

4    third addendum  to the presentence report dated March 13,

5    2025.

6              I've also reviewed Mr. An's sentencing submission

7    dated February 10, 2025, including the exhibits that were

8    attached such as Mr. An's letter to the Court as well as the

9    letters from his children, other family members, friends, and

10   physicians.

11             I've also reviewed the Government's sentencing

12   submission and exhibits dated February  24, 2025.  And Mr.

13    An's sentencing submission reply dated March 3, 2025.

14             Have I overlooked any submissions, Counsel?

15             MR. SOLOMON:  Not from the Government.  Thank you.

16             MR. BRAFMAN:  No, your Honor.

17             THE COURT:  And no, Mr. Brafman?

18             MR. BRAFMAN:  I'm sorry.

19             THE COURT:  And, no, I have not overlooked any of

20   your submissions, sir?

21             MR. BRAFMAN:  None.

22             THE COURT:  All right.  Mr. An, as we talked about,

23   is a permanent resident in the United States, a citizen of the

24   People's Republic of China, and he does have a right to have

25   his national consulate notified of his prosecution and to have

1    consular support.

2              Do you wish to invoke that right, Mr. An?

3              MR. BRAFMAN:  We preserve the right, your Honor.

4              THE COURT:  I'm sorry.

5              MR. BRAFMAN:  We preserve the right.

6              THE COURT:  What does that mean?

7              MR. BRAFMAN:  Then I misheard what your Honor had

8    said.

9              THE COURT:  Has the Government notified the Chinese

10   consulate of Mr. An's prosecution?

11             MR. SOLOMON:  Yes, your Honor.

12             THE COURT:  All right.  I was just advising him that

13   he has the right to receive support.

14             MR. BRAFMAN:  Thank you.

15             THE COURT:  And does he want support for his

16   sentencing here today?

17             MR. BRAFMAN:  No.

18             THE COURT:  All right.  Has ICE been notified that

19   Mr. An is being sentenced today, Mr. Solomon?

20             MR. SOLOMON:  Yes, your Honor.

21             THE COURT:  All right.

22             MS. RANGEL:  HSI.  Homeland Security Investigations

23   has been notified.

24             THE COURT:  All right.  Thank you.

25             And I take it, despite -- we talked about this in

1    the context of the amended plea but I'm going to do this again

2    in the sentencing.

3              Despite knowing there are likely to be immigration

4    consequences, does Mr. An wish to maintain his guilty plea?

5              MR. BRAFMAN:  Yes, your Honor.

6              THE COURT:  I prefer if Mr. An answered the

7    questions.

8              Do you want to maintain your guilty plea knowing

9    that there are likely to be immigration consequences?

10             THE DEFENDANT:  That's correct.

11             THE COURT:  Mr. An, are you satisfied with your

12   attorney, Mr. Ben Brafman and Mr. Jacob Kaplan?

13             THE DEFENDANT:  I am.  I am satisfied.

14             THE COURT:  Good.  Are there any unresolved

15   conflicts or contentions between you and your lawyers, Mr. An?

16             THE DEFENDANT:  No.

17             THE COURT:  Mr. An does appear to be fully alert and

18   to be following the proceedings closely.

19             Do you agree with that observation, Mr. Brafman ?

20             MR. BRAFMAN:  Yes, your Honor.

21             THE COURT:  Is there any reason why we should not

22   proceed with Mr. An's sentencing today?

23             MR. BRAFMAN:  No.

24             THE COURT:  Mr. An, have you been able to read with

25   the assistance of a translator all of the documents relating

1    to your sentencing and to discuss those documents with your

2    lawyer?

3            THE DEFENDANT:  Yes, I have.

4            THE COURT:  Did you have any difficulty

5    understanding those documents relating to your sentencing,

6    sir?

7            THE DEFENDANT:  No.

8            THE COURT:  Are you ready now to be sentenced?

9            THE DEFENDANT:  Yes, I'm ready.

10           THE COURT:  All right.  So, sir, we've already

11   discussed your plea of guilty and you have stated that you

12   maintain your plea of guilty to Count Two.

13           I have reviewed the transcript of your prior plea

14   hearing and I agree that it does satisfy the requirements of a

15   sustainable plea with regard to your knowledge of your rights

16   and the voluntariness of your plea and facts that you stated

17   were sufficient to establish your guilty of Count Two of the

18   superseding indictment.

19           I'd like to just confirm with the Government the

20   conclusion of today's proceeding will be prepared to dismiss

21   Count One and Four through Nine  of the superseding indictment

22   on the underlying indictment.

23           Is that correct?

24           MR. SOLOMON:  Correct, your Honor.

25           THE COURT:    Mr. An, you have the right to make an

1    of statement here.  I've read your letter, I appreciate your

2    letter, what you've stated there.  I think your letter

3    acknowledged that there has been, in fact, a detrimental

4    effect on your loved ones.  I'm happy to hear from you further

5    if you want to be heard.

6              Would you like to be heard, sir?

7              MR. BRAFMAN:  Your Honor, Mr . An would like to be

8    heard but is the  Government going to say anything?  Do you

9    want to hear from me as well?

10             THE COURT:  I will hear from Mr. An first, then

11   Mr. Brafman, then the Government if they wish to be heard.

12             So if you want to do it in a different order I'm

13   happy to hear it in a different order.

14             MR. BRAFMAN:  I thought the Government would go

15   first so I could respond.

16             THE COURT:  They don't usually but do you want to go

17   first, Mr. Solomon?

18             MR. SOLOMON:  I think we prefer not to.

19             Are we first going to go through the guideline, the

20   PSR, any objections.

21             THE COURT:  What I do is I first hear from the

22   parties.

23             MR. SOLOMON:  I see.

24             THE COURT:  Then I go through the PSR and the

25   objections.  I address those objections; I resolve them.  I

1    confirm whether or not a Fatico hearing is required or

2    requested and then I talk about my consideration of the

3    3553(a) factors since we don't have any guidelines.

4              So, Mr. An, why don't I hear from you at this time.

5              (Continued on the next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE INTERPRETER:  Do you want the interpreter to

2    wait until Mr. An finish the whole thing before I read the

3    statement, or a bit and a piece at a time?

4           THE COURT:  Usually what happens is it's piece by

5    piece.  But if you are confident, ma'am, that you can

6    translate the entire statement, we can allow Mr. An to read

7    the statement, that would be fine.  Are you able to do that?

8           THE INTERPRETER:  I prefer it that way, your Honor.

9           THE COURT:  Okay.  Mr. An is going to read his

10   statement then the interpreter will take that statement and

11   translate it for the court.

12          THE DEFENDANT:  I'm going to read the entire

13   statement first.

14          THE COURT:  You're going to read it or he's going to

15   read it?  I want him to state it first.

16          THE INTERPRETER:  That's what he said.

17          THE COURT:  Yes, sir.

18          (Defendant read statement in Chinese.)

19          THE DEFENDANT:  Your Honor, thank you for the

20   opportunity to address the Court today.

21          I have spent the last few years reflecting on my

22   conduct that relayed messages about John Doe from Chinese

23   Government to John Doe without prior notification to the

24   Attorney General of the United States.  I apologize to John

25   Doe One, John Doe Two, and their family.  I did not mean to

1    cause them any harm or pain.

2            I also apologize to my daughter, Angela, for all the

3    trouble I have caused to her because of my conduct.  She has

4    always been a great daughter and know she's a great mother as

5    well.

6            The last number of years have been physically and

7    emotionally difficult for me and my family, especially my

8    children.  However, I know that I can only blame myself for

9    the pain and the suffering this matter has caused.

10           In seeking your leniency, I humbly ask that your

11   Honor consider my children, my family, my health, the mental

12   and physical anguish I endured while incarcerated seven months

13   at the Metropolitan Detention Center, the nearly two years I

14   have spent on restrictive home confinement.  I also ask that

15   you please consider all that I have done in my life to try to

16   make this world a better place.

17           Whatever happens today, I will use my sentence as a

18   motivation to continue for continued self-growth and

19   transformation, and as inspiration to positively influence all

20   those around me.  I fully intend to continue on this path for

21   the rest of my life.

22           THE COURT:  Thank you.

23           Mr. Brafman, did you want to be heard?

24           MR. BRAFMAN:  Your Honor, respectfully, I want to

25   start by thanking the Court for the patience you've

1    demonstrated today.  And I don't believe that this has been an

2    easy sentence for anyone involved.

3            Your Honor, I want to begin by --

4            THE COURT:  I'm sorry.  The interpreter can't hear

5    you.  Turn your mic on, Mr. Brafman.

6            MR. BRAFMAN:  Yes, your Honor.

7            Let me begin again, your Honor.

8            I want to thank you, your Honor, for the patience

9    you have demonstrated today.  I think this has been an

10   agonizing morning for most of us, particularly from the

11   defense perspective.

12           I begin by stating on the record that I have two

13   checks, which I promised the Court, both drawn on my IOLA

14   trust account.  One made payable to the Clerk of the Court for

15   the Eastern District of New York in the amount of $1,276,018.

16   And another check in the amount of $954,340.73 made payable to

17   the United States Marshal.  The $1,276,000 check represents

18   the restitution that your Honor has ordered.  I have a copy of

19   the Court's final order with me today.

20           With respect to the balance of the forfeiture, the

21   $954,000 amount is the amount that we have agreed to, which is

22   the balance of forfeiture when added to the seized money that

23   has been seized from the very beginning of this case.

24           THE COURT:  May I interject about that, sir?  The

25   reason I had difficulty signing the originally presented

1  proposed forfeiture order is I cannot forfeit assets that

2  don't belong to the defendant.  And I did not see, just on the

3  face of the names on the accounts, that there was any relation

4  to the defendant.  I think since that time you have satisfied

5  me that the individuals whose funds are being forfeited from

6  accounts in their name, they've confirmed they are the owners

7  of the funds and that they are agreeing to the forfeiture of

8  those funds on behalf of Mr. An.

9            MR. BRAFMAN:  That's correct, your Honor.

10           THE COURT:  Ms. Rangel?

11           MS. RANGEL:  Briefly, your Honor.  I believe the

12  check should be for 945,000 not 954,000.

13           MR. BRAFMAN:  You can keep the extra $9.

14           THE COURT:  It's a $10,000 mistake.

15           MS. RANGEL:  I wanted to point that out.

16           MR. BRAFMAN:  I represent to the Court that these

17  funds have been sitting in my escrow account since shortly

18  after the defendant's plea before Judge Chen, and I was never

19  instructed who to give them to and how to write the checks.  I

20  apologize for the typo in the check amount.

21           Your Honor, I want to --

22           THE COURT:  May I ask Ms. Kedeshian, can you give

23  him a refund so that you're taking in only what you agreed to

24  accept from him?

25           MR. BRAFMAN:  I'll rewrite the checks this afternoon

1   and have them Federal Expressed to Ms. Kedeshian or

2   hand-delivered tomorrow.

3            THE COURT:  Ms. Kedeshian, may I hear from you?

4            MS. KEDESHIAN:  Your Honor, if Mr. Brafman is

5   intending to submitting an accurate check, then we'll accept

6   that, as opposed to some type of process of the Government

7   having to refund.

8            THE COURT:  All right.

9            MS. KEDESHIAN:  With respect to the restitution

10  moneys, I wanted the record to be clear, those should be made

11  payable to the Clerk of Court, not to me.

12           THE COURT:  Do you understand that, sir?

13           MR. BRAFMAN:  Yes, your Honor.

14           THE COURT:  You should get a receipt from the Clerk,

15  then Mr. Solomon can send it where it needs to go.

16           I'm sorry, Mr. Brafman, please continue.

17           MR. BRAFMAN:  Yes, Judge.

18           Your Honor, I know that the Court has read our

19  submission in its entirety and I don't want to spend a

20  substantial amount of time on this but, your Honor, in

21  fairness to Mr. An, there are a lot of people in courtroom who

22  may never read the record.  I know the Government is going to

23  eventually stand up and say bad things about him and his

24  conduct.  I think there are some very positive things that I

25  would like to briefly share with the Court.

1          I also want to represent to your Honor that I think

2    what happened in this case is quite stunning.  In that the

3    Government for seven months fought us at every bail

4    application and created havoc in a way that suggested that if

5    you ever agree to the bail request, that Mr. An would find

6    someway to get out of the country.  And despite this Court's

7    specific order to the Government and the Bureau of Prisons

8    that Mr. An be seen by specialists, that he be given his

9    medication, that he be seen by gastroenterologists, that he be

10   seen by a thyroid specialist for the lump that began to grow

11   on his neck, those orders were, quite frankly, were completely

12   ignored by the Bureau of Prisons.  Whatever the fault may be

13   and whoever is at fault, your Honor, this should suggest to

14   the Court, respectfully, that even having a specific order

15   from this Court, the Bureau of Prisons in its infinite wisdom

16   allowed the defendant to languish during lockdown periods,

17   during periods when his difficulty resulted in substantial

18   rectal bleeding.  There was a time when he was not provided

19   with the medication that he required to treat colitis, serious

20   colitis, also very serious Crohn's disease.

21          We've had him examined by specialists who have

22   written to your Honor that demonstrate that as a result of the

23   essentially ignoring his medical problems there is now a hole

24   in his colon, which will require infusions for the rest of his

25   life, which will require additional medication and eventually

1   maybe require surgery.

2           I suggest, respectfully, that the Bureau of Prisons,

3   in my opinion, and based on their record in this case, is

4   simply either unwilling or unable to follow the instructions

5   even when they are very basic.  I'm not faulting the

6   Government for that.  But at some point -- I think this is the

7   point that I'm asking your Honor to consider -- at some point,

8   despite the reservations for seven months in agreeing to any

9   bail conditions however restrictive they would be, they

10  ultimately threw their hands up and said we agree to release

11  Mr. An on serious home confinement with electronic monitoring,

12  and the only way he gets out is either for medical visits or

13  by preapproved visit to his lawyers office.

14          So in addition to the seven months of hell he lived

15  through at the MDC, and I use that word advisedly, your Honor,

16  because every time we went to visit him there he looked worse

17  and worse and worse, and that's as a result of his

18  deteriorating medical condition.  Now, your Honor, the home

19  confinement is another factor that I ask your Honor to

20  consider when deciding whether or not a sentence that is

21  adequate but not greater than necessary is appropriate in this

22  case.  In our written submission, and I repeat our request at

23  this time, we are respectfully asking your Honor to impose a

24  sentence of time served with a period of supervised release to

25  follow at the time of sentence.

1          THE COURT:  With home confinement and location

2   monitoring?

3          MR. BRAFMAN:  If appropriate in this case, yes, your

4   Honor.

5          Your Honor, I think on balance, the Government

6   suggests that everyone who looks at this sentence is going to

7   not be deterred from committing this crime.  Well,

8   respectfully, the defendant who is 59 years old as we speak, I

9   don't believe that you will ever see him again in this

10  courtroom.  I don't believe that he should be deemed as a

11  recidivist, and I say of that advisedly.  I think he is a very

12  intelligent man.  I'm going to go through very quickly the

13  comments he made to John Doe Two at the very interception to

14  suggest that --

15         Did your Honor want to say something?

16         THE COURT:  I was just going to say that when I

17  consider deterrence it's not just specific deterrence to

18  Mr. An, it's really general deterrence.  My understanding is

19  that this Operation Fox Hunt has fairly widespread adverse

20  impacts on people living in the United States.  This is not

21  the only case.  And there is something to be said about

22  general deterrence.

23         MR. BRAFMAN:  Yes, your Honor.

24         THE COURT:  And ensuring that people who might want

25  to act as agents of a foreign Government, whether it's

1    Operation Fox Hunt or some other foreign Government's program,

2    that there are protocols that should have been followed that

3    weren't.  And we want to deter other people who are citizens

4    of foreign Governments operating in our country to pressure,

5    surveil, threaten people who are lawfully in the United States

6    living here.

7             MR. BRAFMAN:  Your Honor, I'll address general

8    deterrence in a moment.

9             I think that anyone who looked at what happened in

10   this case to Mr. An, where he spent seven months incarcerated

11   in the worse conditions you can possibly imagine, conditions

12   that have been confirmed by other judges in this district and

13   in the Southern District of New York.  In addition to almost

14   two years, 18 months, of home confinement, in addition to

15   paying a $5 million penalty and accepting responsibility

16   shortly after this case began, I really think, Judge, that the

17   terms of general deterrence it's not as of he got a slap on

18   the wrist.  Respectfully, he went through living hell for

19   seven months and ultimately the Government threw its hands up

20   and said, you know what, instead of trying to schedule medical

21   appointments that the Bureau of Prisons is simply not willing

22   to follow we'll allow him out.  That's what happened in this

23   case, Judge.

24             So in terms of general deterrence I think that there

25   has been severe consequences to Mr. An in this case.

1     I will also indicate, Judge, I say this with great

2  respect for your Honor's independence, that this case, in my

3  humble opinion, does not warrant additional incarceration.  I

4  think that's a fair statement given the other cases and the

5  cases which the Government cites in its sentencing memo are so

6  distinguishable from the facts in this case that I just don't

7  understand why they cited those cases.  In particular, Judge,

8  I also point out when the defendant first approached John Doe

9  in September of 2018 that stopped.  There is no contact with

10 John Doe Two for almost 18 months until at the behest of the

11 Government John Doe Two reaches out to the defendant and sets

12 up a meeting.

13     At the very first meeting, on the Government's own

14 tape, John Doe Two suggests:  I should have met you earlier, I

15 should have asked for a meeting earlier.  I'm sorry I didn't.

16     So to suggest that between September 2018 and

17 January 2020 this defendant was roaming around trying to

18 harass this family is just belied by the Government's own

19 evidence.

20     I also point out, Judge, that in the very first

21 conversation John Doe says:  I regret not meeting you earlier,

22 I should have visited you earlier.  And at the end of the day,

23 from Mr. An's perspective -- I ask you, your Honor, to try and

24 put yourself in his place -- hearing that, it suggests to me

25 that in his state of mind at that time he does not believe

1    that he is harassing this particular family or this particular

2    defendant.

3                And that at the end of the day, the next

4    conversation, which is the Government's take in pertinent part

5    John Doe Two says:  To be honest, I know you're acting out of

6    good intentions and we would like to put an end to this saga

7    as well.

8                So to suggest that he was engaged in repeated

9    harassment of this family is wrong, Judge; I say that

10   respectfully.

11               I understand that the concept of a foreign citizen

12   reaching out and trying to act on behalf of a foreign

13   Government is something we should deter, in this case from the

14   inception there is no harassment, there is no coercion.  I

15   think in every conversation that follows, and this is the

16   Government recording these conversations, these are not

17   defense conversations, Mr. John Doe Two says:  I think doing

18   good deeds is a good thing.  I really appreciate you.  In

19   addition, I know you don't have any malicious intent towards

20   me, otherwise I would not meet with you.

21               That's what Mr. An is told by the purported victims

22   of his harassment on behalf of the Government in China.

23               I would also indicate, Judge, that the John Doe Two,

24   the punitive victim of this harassment even thanks him for

25   having his daughter Angela, who your Honor will sentence this

1   afternoon I believe.  He thanks him for having his daughter

2   housed and feed and transport the other people who came into

3   this case from China and they took care of everything.  They

4   didn't require John Doe Two to do anything.  He says:  I am

5   truly grateful to you.  That's a quote from a tape that we

6   have provided the Bates number to your Honor.

7           I would also indicate, your Honor, that Mr. John Doe

8   Two repeatedly, repeatedly, asked Mr. An to tell him what

9   would be the consequences if I don't agree.  And Mr. An is

10  reluctant to convey that information, Judge.  And he doesn't.

11  And suggesting that he was coercing John Doe two and John Doe

12  One is just simply not an appropriate conclusion from these

13  tapes.

14          Judge, it goes further.  Because what Mr. An then

15  continues in these recorded conversation is he tries very hard

16  to convince the son that there can't be any risk to your

17  father.  I will go with him.  I will make certain that he's

18  not detained.  I will make certain that the fine or whatever

19  he owes China is paid.  And I will pay it if he can't do it.

20          I ask, your Honor, to conclude that from these

21  conversations I would think that there is never going to be

22  another case that anyone in acting as an agent of a foreign

23  Government would seek to coerce someone by having these

24  conversations.  I ask your Honor to also conclude that Mr. An

25  says to John Doe Two:  If there is any risk, even the

1    slightest risk to your father, then we should abandon this

2    effort to bring your father back.  That is to allay any

3    concern by this family, Judge, that there is going to be any

4    type of pressure.

5              And when they ask him, about the risk he says:  Even

6    if there is a slight risk to your father we should not do

7    this.

8              Your Honor, I also suggest, respectfully that, when

9    an impact statement comes to the Court amidst negotiation by

10   their lawyer to essentially bring restitution to a head, that

11   is not a normal victim impact statement.  I don't dispute that

12   this family has suffered some consequence, but that's

13   decisions that they made.

14             Your Honor, Mr. An did not know at the time that

15   they were changing their location or that they were living

16   somewhere else.  He wasn't told that.  He wasn't --

17             THE COURT:  Of course he wouldn't have been told,

18   they were trying to hide from him.

19             MR. BRAFMAN:  But, Judge, they were not hiding when

20   they had these conversations.  What they were telling Mr. An

21   suggests there is no way he should conclude that they were in

22   any way in distress because they are thanking him repeatedly

23   on these tapes for being so kind, for being so generous, for

24   volunteering to bring John Doe One there.  I think, Judge,

25   that is the distinction between this case and the other cases

1    cited by the Government.  Your Honor, when he tells John Doe

2    One safety of your father has to be the priority, when he

3    accepts the terms, we just need to meet and discuss together

4    until we eliminate all of the safety concerns.

5              Now, Judge, if he said to this family, we're going

6    to bring you back and you're going to suffer and we're going

7    to make sure you go to jail, they would say, look at that

8    information, that's suggests that he needed to be punished.

9    But when he says the opposite, when he says all of these

10   things, that allows you to conclude that he is not acting as a

11   sinister agent, that he's acting as someone who is trying to

12   help these people deal with this.  And when he says to them,

13   if safety or risk is even slight, then don't do this, don't go

14   back, don't do it.  When he says that, he is not acting

15   necessarily as an agent of the Government in China, but he is

16   trying to convince this family that they should have no

17   concern about going back.

18             THE COURT:  Didn't he also tell them, though, that

19   the relatives in China would be harassed and bothered and

20   would suffer.

21             MR. BRAFMAN:  Yes, but not by him.  It's the Chinese

22   Government.

23             THE COURT:  It came from him.  He's saying those

24   words, correct?  He's willing to say those words, even if it's

25   a message from the PRC, he's saying those words to John Doe.

1          MR. BRAFMAN:  Yes.

2          THE COURT:  Those are not benign words; those are

3     threats.

4          MR. BRAFMAN:  But you can't balance, you can't

5     discard all the good things he says to them by that one

6     statement in months of recordings, Judge.  Because on balance,

7     if -- and Mr. An has accepted responsibility.

8          And so to suggest that he has not suffered and that

9     additional incarceration should be considered by your Honor,

10    if that's the conclusion you come to, Judge, then I have

11    nothing further I should say.  But what I'm trying to convince

12    you of, Judge, is that this man has suffered.  He has accepted

13    responsibility.  He has been in prison for seven months.  He

14    has paid a fine and forfeiture and restitution of a

15    substantial amount.

16         And your Honor, the thing about the cases cited by

17    the Government, they are really distinguishable from this

18    case.  I just want to briefly tell you, very quickly, why they

19    are so distinguishable.

20         In *United States v. Alvarez* the agent in that case

21    worked with the Cuban Government for 30 years.  His assignment

22    was to share sensitive non-public information on anti-Castro

23    groups and individuals, providing the Government with

24    potential ammunition to use against those individuals should

25    the need to do so arise.  That's not in this case at all.

1           In *United States vs. Li*, the defendant worked for

2     the Chinese Government for ten years.  He sought to provide

3     information to help them bypass U.S. companies' cybersecurity

4     defenses, that raises national security issues, your Honor.

5           And then *United States vs. Fuentes*, that defendant

6     worked, and he went to trial, and after trial they

7     communicated to the Russian Government official and his cases

8     are consistent with the tactics of Russian intelligence

9     services, spotting, assessing, recruiting, and handling

10    intelligence assets and sources.

11          And, your Honor, in *United States vs. Abouammo,* the

12    defendant was facing 87 to 108 months in a guideline case,

13    this was after trial.  The defendant in that case collected

14    information for the Iranian Government.  I'm not suggesting

15    that communist China or Iran, one is better than the next, but

16    in this case we're trying to bring someone back to deal with

17    the problem he has in China.

18          He's not a young man, he's an older gentleman.

19    Throughout the conversations my client is demonstrating

20    kindness.  He is demonstrating affection.  A benign

21    conversation in which he is suggesting that if there is any

22    risk whatsoever that the defendant should not go back.  And

23    finally --

24          THE COURT:  But the Interpole red alert I think it

25    said he faced a life sentence.  Am I right about that?

1          MR. SOLOMON:  Yes, your Honor.

2          THE COURT:  That's a serious sentence.

3          MR. BRAFMAN:  But he's also negotiating with the

4     Communist party that if he pays the restitution, there won't

5     be any prison sentence.  If he there is any slight risk to the

6     safety of this gentleman, then they shouldn't go back.  How is

7     that consistent with an agent who is trying to manipulate or

8     harass someone to go back?

9          THE COURT:  Are you were saying that Mr. An had the

10    authority vis-a-vis the Chinese Government to make promises if

11    John Doe One went back that he would not face any thing more

12    than Mr. An paying his financial penalties, and then he's

13    allowed to leave China and come back?  He doesn't have that

14    kind of authority, does he?

15         MR. BRAFMAN:  There was discussion with the Chinese

16    official who came here and they discussed that.  There was a

17    document that was being forwarded that allows you to conclude

18    that there would not be any detention.

19         Your Honor, he said it.  And if he didn't have the

20    authority to say it, he says on the tapes:  If there is even a

21    slight risk, then you should not go back.  That, Judge, is not

22    someone acting as an agent of the Chinese Government without

23    any concern for the person he's talking to.

24         Your Honor, I also indicated to the Court that you

25    need, respectfully, to also consider the life of the

1    individual who lived here for at least 18 years.  When you

2    read the letters that we have provided to the Court you will

3    see there is a side of Mr. An that suggests he's a generous,

4    caring individual.  There are examples in these letters, I'll

5    go through them briefly.

6              THE COURT:  I want to assure Mr. An, and you, that I

7    look at the whole picture of what you've presented, what the

8    Government has presented.  And I don't judge Mr. An for the

9    worst thing he's ever done; this may be the worse thing he's

10   ever done.  I must impose some sort of sentence, but I'm

11   looking at the whole person.  I understand he's a generous,

12   charitable person who has built homes in his native village.

13   He sponsored kids for scholarships.  He's given people

14   opportunities to make a go of it as he raises funds for

15   children.  He opens his home to many people from his village

16   and elsewhere.

17             I'm not judging his character, what I'm judging is

18   the offense.  That's what my job is.

19             I want to assure Mr. An that I don't define his

20   character as the worst thing that he's ever done.  If this is

21   the worse thing that he's ever done, it is what I have to

22   sentence him for.  But against that particular offense, I have

23   considered all the other wonderful qualities that have been

24   described by his family members and in your letters.

25             MR. BRAFMAN:  I've been before the many Courts in my

1    life, the basic argument is that you have to impose a sentence

2    that is not greater than necessary for the offense in

3    question.  In this case, the offense in question is failing to

4    register as a foreign agent.  At the end of the day, there are

5    other cases that dealt with that crime, have facts and factors

6    that cry out for imprisonment.  This case does not.  In this

7    case the conversations that have been recorded by the

8    Government demonstrate that he is acting, maybe as an agent,

9    but also acting honorably with these people.

10              I suggest when you look at the chronology of events,

11   the first conversation that he has with John Doe Two, the

12   punitive victim of this harassment, the first conversation

13   what John Doe Two volunteers is:  I should have met you

14   earlier, I should shouldn't have waited 18 months to meet with

15   you.

16              And that suggests that Mr. An's mind, with this

17   particular family, that he is not acting in a sinister

18   fashion.  That these people are looking to for him for help.

19   And that they have been sent here by the Government.  He

20   doesn't know that they are recording the conversation.  So

21   he's not feeding the tape.  I'm certain that John Doe Two, if

22   he were here and I could question him, would demonstrate that

23   what he said when he said that, he meant it, or at least he

24   allowed the defendant to conclude from that that he was acting

25   as a friend.

1          I can't erase those words, Judge.  When he said that

2    I know what your Honor is thinking, he's trying to lull Mr. An

3    into a sense of security that he could continue negotiating or

4    discussions with his family.  But no one tells Mr. An to say

5    to this family:  If there is any slight risk whatsoever then

6    we should stop this and we should not continue having these

7    discussions.

8          He suggests to them that maybe we should meet and

9    maybe we should discuss all aspects.  And they don't take him

10   up on it Judge.  At the end of the day, nothing happens.  They

11   don't go back.  And he doesn't continue to act as a foreign

12   agent of the Government.

13         I understand that they arrested him, but they don't

14   erase these conversations.  When you listen to all of them,

15   your Honor, when you listen to all of them, I think at the

16   enter of the day your Honor has a right to conclude that in

17   any other foreign agent failing to register you're not going

18   to have these conversations.  They are going to be strong-arm

19   conversation.  They are not going to be give, him an out,

20   don't worry, nothing is going to happen.

21         What Mr. An is trying to do, the reason he's pled

22   guilty to it, is from our research, even if they are acting

23   both as and as a friend and agent where you didn't register,

24   you're technically guilty of the crime.  But to suggest that

25   he was trying to coerce Mr. An (sic) to go back, to suggest

1  that he was trying to harass him.  There is an 18-month window

2  after the first visit when he doesn't do anything.  He doesn't

3  go, he doesn't find him.  Ultimately, the Government says, you

4  know what, we should find Mr. An.  And if the Government

5  doesn't set up that process, then we're not having this

6  discussion.  Because you have a right to conclude, Judge, that

7  Mr. An would go on to do his charitable work, would go on to

8  do work to help Chinese American students in this country.

9           One of the most powerful letters, Judge, is from the

10  kid in community college and Mr. An funded a scholarship.

11  From that scholarship he went on to Georgetown.  And as a

12  result, he is now working in a tech sector as an engineer.

13           Judge, that stuff speaks very strongly in favor of

14  Mr. An not receiving any further punishment by your Honor

15  sentencing back to prison.

16           If your Honor takes their suggestion, well, you

17  don't have to send him back to the MDC, you can send him to

18  another prison, he doesn't qualify for camp.  I don't believe,

19  Judge, that he's going to qualify for any prison program, that

20  applies only to citizens.  And I don't believe that your Honor

21  is thinking of putting him a prison hospital because that's a

22  maximum security facility.  Anywhere else, when he needs an

23  infusion, when he needs a colonoscopy, they are not going to

24  jump and do it -- the way they ignored him in the MDC.  That's

25  a Bureau of Prisons facility, and any Bureau of Prisons

1    official who promises your Honor that they are going to take

2    his physical condition and treat him, they are not going to

3    do.

4             I think you know that, because when you ordered them

5    to do it they ignored you, Judge.  And the Government gave up.

6    And then the Government said, you know what, we're going to

7    give him bail because that's the only way we're going to

8    assure ourselves, the Government, that he's not going to

9    languish there and maybe die.

10            He had a lump on his neck the size of a tennis ball.

11            THE COURT:  I'm aware.

12            MR. BRAFMAN:  I know you're aware, Judge, I get the

13   sense that your Honor is considering maybe putting him back in

14   prison.  I really don't want that to happen.  I really don't

15   think that's necessary in this case.  And if your Honor

16   suggests that because of general deterrence the court must

17   make a statement, he's already been punished.  Judge, seven

18   months in hell is a punishment.

19            THE COURT:  I understand.

20            MR. BRAFMAN:  And 18 months under house arrest is a

21   punishment.  I know your Honor has the discretion to do what

22   you think is right.

23            I'm going to stop now because I know your Honor has

24   read everything.  Do what you think is right, Judge.

25            THE COURT:  I always try, Mr. Brafman.

1           Mr. Solomon.

2           MR. SOLOMON:  Thank you, your Honor.

3           First of all, just briefly, this is a national

4    security case.  This case implicated the safety of one or more

5    U.S. persons from being affected by an inter-transnational

6    oppression scheme perpetrated by a hostile foreign state, that

7    is the People's Republic of China Government.

8           What the defendant and his co-conspirators did in

9    this case fundamentally undermine U.S. national security,

10   international sovereignty.  Members of the Chinese diaspora

11   community here in New York City, and throughout the country,

12   do not feel safe from the reach of the People's Republic of

13   China Government.  They, to the extent they belong to

14   organizations like the organizations the defendant runs, they

15   are perpetually fearful of having their communications

16   monitored or reported back to the People's Republic of Chinese

17   Government.  They do not feel free to speak freely.

18          I think what is worth noting here is what the

19   defendant did here was for greed, it was for economic

20   purposes.  The defendant thought that if he persuaded John Doe

21   One to return to China, that he would reap economic rewards

22   from the Chinese Government.  That's what is borne out in the

23   tapes.

24          So I think we strongly disagree with any notion that

25   what the defendant did here was in any altruistic or generous.

1          First of all, Mr. Brafman has mentioned several

2     times that the first recorded conversation was instigated by

3     the U.S. Government where John Doe Two was wearing a wire and

4     his conversations with the defendant were recorded.  That

5     happened for a simple reason.  I think, first of all, we

6     should note for the record when we first met with John Doe Two

7     he did not want to cooperate with the Government.  Like many

8     other victims of trans-national oppression schemes, he was

9     scared of us; and he was even more scared of what the Chinese

10    Government would do to him here on U.S. soil and to his

11    relatives overseas.  It took many meetings before the agents

12    were able to convince him to make recordings against the

13    defendant.

14          In fact, we have many other victims we've identified

15    throughout the country who have been victims of trans-national

16    oppression schemes.  They are so terrified of the Chinese

17    Government that they don't cooperate with us, and as a result

18    we can't bring the cases.  The reason why the agents persuaded

19    John Doe Two to make that initial recording was to corroborate

20    what he had been reporting.  And what he recorded was correct,

21    that the defendant had been harassing him and threatening him

22    to try to get him back to China.

23          With respect to the honorifics that Mr. Brafman

24    repeatedly referred to in the conversations, I think the

25    record is clear that the defendant occupies and occupied a

1  position of prominence within the Chinese diaspora community.

2  He is enormously wealthy.  If you look at the PSR, he's got

3  according to his financial disclosures, he's worth

4  approximately $44 million.  He's known as a leader of the

5  Chinese community.  He owns or owned one of the most prominent

6  hotels in Flushing, which is one of the most important

7  concentrations of the Chinese diaspora community in the United

8  States.

9           I think as we mentioned previously, when working on

10  this investigation, many linguists, Chinese speaking

11  linguists, did not want to work on the case when they saw

12  Mr. An was the person who had been recorded.  They were so

13  fearful of him.  That's what is borne out with the

14  conversations between defendant and John Doe two.

15           John Doe Two was being very polite to someone who is

16  superior to him within the Chinese community.  I think it's

17  worth noting that we, and the U.S. Government, took John Doe

18  two's security seriously enough to make sure that these

19  recordings were made and that we knew at all times where he

20  was and the agents were watching to make sure that nothing bad

21  would happen, from a distance obviously.

22           Another thing I'll address, this notion that Mr. An

23  demonstrated some degree of hospitality toward the person

24  identified in the Indictment John Doe Three, the person who

25  was coerced to --

1              THE COURT:  The relative.

2              MR. SOLOMON:  Correct.  There was nothing charitable

3    about hosting John Doe Three.  John Doe Three was forced to

4    come to this country to try to persuade his relative to return

5    to the United States.  The defendant knew that.  That's borne

6    out by the recorded conversations.  It's akin to basically

7    saying to John Doe Three, if you don't go, there will be

8    serious consequences.  You do not have a choice.

9              What is also borne out is that John Doe Three was

10   threatened by the Chinese Government every day that he did not

11   make connection or was unable to contact John Doe One or Two,

12   he would lose part of his per diem.

13             So this was an extremely coercive situation.  The

14   defendant represented the primary spoke of the organization

15   that brought John Doe Three here to the United States.

16             THE COURT:  Do you want to address his assurances

17   that nothing bad would happen if John Doe One were to return

18   and that his statement that if there is any risk whatsoever to

19   John Doe One we shouldn't pursue his return.

20             MR. SOLOMON:  I think all we have is what is on the

21   recording for that representation.  Certainly the defendant

22   was acknowledged in the recorded conversations by the

23   co-conspirators in China, all members of the Chinese

24   Government, as someone they trusted in.

25             So I think, first of all, it's worth noting that the

1   defendant occupied a position of imminence trust with the

2   Chinese Government.  It's unclear whether you can trust what

3   the Chinese Government says, when they are trying to convince

4   someone to come back.  What assurance could the defendant

5   provide if in fact John Doe One went back and was

6   incarcerated, contrary to his promises.

7          Something else worth noting is that John Doe One and

8   Two and other victims in this case chose not to come today

9   because they still feel persecuted by the Chinese government.

10  The lawsuit is still ongoing, and so John Doe's One and Two

11  are still being victimized by this oppression scheme.

12         I think the last thing I'd like to mention, a couple

13  more quick points.  One is regarding the other Section 951

14  cases.  In none of those cases was someone specifically

15  victimized in the same way that John Doe's One and Two were in

16  this case.

17         In this case we had the defendant who threatened,

18  harassed people in the United States.  So this is not just a

19  technical violation case of someone failing to register that

20  they are acting on behalf of foreign Government; he did far

21  more than that.  In effect, right before his arrest, days

22  before his arrest, the defendant sent a photograph of the

23  proposed guilty plea.  And I also want to --

24         THE COURT:  Sent it where?

25         MR. SOLOMON:  He sent it to or he received it and

1  showed it to John Doe Two.  It was the proposed confession,

2  your Honor.

3          THE COURT:  Confession meaning what?

4          MR. SOLOMON:  Meaning basically an allocution.

5          The only reason why John Doe One or John Doe Two

6  didn't go back to China is because we were successful in

7  undermining this scheme, and obviously we apprehended and

8  prosecuted the defendant.

9          THE COURT:  Do you want to address the dreadful

10  conditions he suffered under MDC for seven months, and the

11  statement that you agree that ultimately because the MDC was

12  not complying with my orders to give him adequate care that

13  the only option to keep him alive and make sure his health

14  didn't suffer was to release him; and he didn't run to the

15  embassy, as you feared.

16          MR. SOLOMON:  He did not run to the embassy or the

17  consulate or the Mission to the United Nations, it's true, but

18  those were in part to the restrictive measures that your Honor

19  instituted.

20          I think what happened at MDC is regrettable.

21  Obviously, we tried to do everything in our power to arrange

22  for the doctors visits, and examinations that the Court had

23  ordered to take place.

24          I think what is worth noting is that he would not be

25  sent back to the MDC.  There are facilities within the Bureau

1    of Prisons that have not had the same issues that the MDC has.

2    And it's our hope and understanding that the accommodations

3    will be better.

4                THE COURT:  Do you agree with Mr. Brafman's

5    statement that any medical facility would be a maximum

6    security facility, for example Butner, Devins, Fort Dix.

7                MR. SOLOMON:  We can't make reference to those

8    specific institutions.

9                THE COURT:  The most I can do is recommend a

10   facility.  But do you know whether those medical facilities

11   with specialized care or maximum care facilities -- a lot of

12   defendants want to be designated to a medical facility, so

13   I've not heard that it's a more severe place.

14               MR. SOLOMON:  It's something we're not familiar with

15   but we can get back to you during this proceeding.

16               THE COURT:  Is there anything else you wanted to

17   say, Mr. Solomon?

18               MR. SOLOMON:  Not unless you have any further

19   questions.

20               THE COURT:  Anything from you, Mr. Brafman?

21   Anything you would like to add?

22               MR. BRAFMAN:  Your Honor, the only medical facility

23   I've had experience with in the Bureau of Prisons is Butner.

24   And the Butner facility is a maximum security facility.  And

25   the person in the next bed, if you're in a ward, could be

1    there for killing a federal officer and he's chained to the

2    bed.  I don't think that the Court needs to burden the Bureau

3    of Prisons with someone who is going to -- as the only expert

4    that has written to the Court -- he's going to need infusions

5    on a regular basis.  If you're in a Bureau of Prisons facility

6    you have to get out in order to do that.  They don't have the

7    capacity to do those infusions inside a Bureau of Prisons

8    facility.  They can give you dialysis, but if it's a middle

9    procedure, they have to get you to a specialist.  That's an

10   agonizing experience, Judge.

11            And if that's of concern to your Honor, then I ask

12   you to consider that he has spent seven months of hell

13   already.  And I don't believe that anybody who would be

14   thinking of acting as a foreign agent will agree to that type

15   of punishment.  That's all I was trying to suggest, Judge.  I

16   don't know what else I can say to hopefully sway your Honor to

17   imposing a sentence of time served.  I don't know what else I

18   can say.

19            THE COURT:  All right.  Thank you.

20            The Government usually takes the position that the

21   BOP is capable of handling most medical issues.  Do you have

22   any specific information about these infusions that Mr. An's

23   physician has recommended on a regular basis?  Is there a

24   federal facility that would be able to administer those types

25   of infusions?

1          MR. SOLOMON:  We don't have specific information as

2     to those specific procedures that were suggested.  We can

3     inquire.

4          THE COURT:  If you can do it before we conclude,

5     that would be great.

6          Thank you Mr. An, and the Government, and

7     Mr. Brafman for your statements.  I appreciate hearing from

8     you.

9          I understand that Mr. An has submitted numerous

10    letters.  He has the right to have friends and family here in

11    his support.  I have read all those letters and I want to

12    thank whoever did write letters for their time.  I want to

13    thank any of your friends and family who are here to support

14    you.  All of those letters are helpful to me to understand and

15    to gain a fuller picture of who you are and what your presence

16    in their lives means to them.  I think that I would not have

17    learned about some of your good deeds had those letters not

18    been written, and I appreciate everyone who has written in.

19         Is there anyone here that you would like me to

20    acknowledge, Mr. An?

21         THE DEFENDANT:  Those are friends who are so good to

22    me.  Many people want to come, but we afraid that would have a

23    bad impact, so we did not -- we prevented a lot of people to

24    come.

25         THE COURT:  It wouldn't have a bad impact.  I would

1   just say, they are all welcome.  This is an open court.

2           And those who did write and who have shown up today,

3   obviously, are expressing their support and their affection

4   for you.  I appreciate that they have taken the time, because

5   I'm sure they are busy people.

6           I would like to acknowledge letters of support from

7   Meijuan Yang, his ex-wife.  Another ex-wife named, Xilin Song.

8   A daughter, Yuanyuan Yuan.  A daughter, Guangya An.  A son,

9   Guangtai An.  A daughter whose name I will not mention because

10  she's only 12.  And Minjie Liu, Mr. An's ex-wife's sister.

11  But again I'm grateful to have those letters.

12          The parties have raised certain factual disputes

13  regarding the offense conduct described in the presentence

14  report.  On January 21 and 24 of 2025 I directed the parties

15  to confer and advise the Court as to whether they wish to

16  schedule a Fatico hearing to resolve the issues.  In a letter

17  dated January 31, 2025 the parties informed me that they did

18  not intend to seek a Fatico hearing.  They would inform the

19  Court as to whether or not any party had changed their mind by

20  February 28.  As of today, I have no requests for a

21  Fatico hearing.  So in an abundance of caution I want to make

22  sure that nobody wants a Fatico hearing at this time.

23          MR. BRAFMAN:  That's correct, your Honor.

24          MR. SOLOMON:  That's correct.

25          THE COURT:  I have reviewed all of the documents

1    that were submitted and the objections to the presentence

2    report.  And all of their supporting submissions in support of

3    their objections or in response to the objections and I will

4    set forth my findings of fact in a moment.

5            In reviewing the presentence report, the report

6    states that Count Two, the count of conviction is not

7    referenced to a specific guideline and that no sufficiently

8    analogous guideline applies.  I believe that all the parties

9    agree that that is the case.  As a result, the Probation

10   Department has determined that the provisions of 18 United

11   States Code Section 3553 should be considered and guide this

12   Court's sentencing determination.

13           The statutory maximum term of imprisonment in the

14   presentence report and in the criminal code at Section 951(a)

15   is ten years.  There is no statutory minimum.  I may impose a

16   term of supervised release of not more than three years.  And

17   the guideline range for a term of supervised release is one to

18   three years, 18 U.S. Code Section 3583(b)(2) and guideline

19   5D1.2(a)(2).  The presentence report also states that Mr. An

20   is eligible for not less than one more than five years of

21   probation; and absent extraordinary circumstances, I must

22   impose either a fine, restitution, or community service as a

23   condition of probation.  That's under section 3553(a)(2).

24           Mr. An has objected as follows to the presentence

25   report.  First, he objects to paragraphs 42, 44 -- which he

1   mistakenly referred to as 22 but it's 44 -- 46, 47 of the

2   presentence report, which describes examples of threatening

3   messages that Mr. An conveyed on behalf of the People's

4   Republic of China.

5           Count Seven of the Superseding Indictment charged

6   Mr. An with knowingly and intentionally conspiring to travel

7   in interstate and foreign commerce with the intent to harass

8   and intimidate one or more persons; specifically, John Doe

9   One, John Doe Two, and John Doe Three, who lived in China and

10  who was pressured to come to the United States and persuade

11  John Doe One to return to China.  In the course of this, would

12  cause or attempt to cause and would be reasonably expected to

13  cause those individuals substantial emotional distress in

14  violation of Section 2261A(1)(B).

15          Mr. An disputes the Court's consideration of this

16  conduct and argues that in conveying messages to John Doe Two

17  he was, quote, "not seeking to harass or threaten John Doe Two

18  and his family.  Rather he was relaying messages from the

19  Chinese Government and seeking to ameliorate the situation."

20          The Government responds that this argument ignores

21  the practical reality of the harms that John Doe One would

22  have faced had he returned to the PRC.  And the fact that,

23  quote, "The defendant was well aware of those harms as

24  reflected not only by his admission that he knew the pain the

25  PRC Government could inflict, but also by the defendant's

1  repeated statements as to directly to John Doe Two the PRC

2  Government could and would inflict such harm on John Doe One

3  and his family."  The Government further argues that John Doe

4  Two's victim statement is clear that he felt that Mr. An was

5  communicating threats from the PRC Government particularly in

6  light of Mr. An's stature within the community and close ties

7  to the PRC Government.

8          In the second addendum to the presentence report,

9  the Probation Department has declined to make any changes to

10  the presentence report based on the defendant's objections

11  regarding the conduct underlying Count Seven.

12          The Second Circuit instructs us that it is the,

13  quote, "Government's burden to establish material and disputed

14  facts by the preponderance of the evidence," *United States vs.*

15  *Streich*, 987 F.2nd 104, 107, decided in 1993.  And citing

16  *United States vs. Guerra,* 888 F.2d 247, 251 decided by the

17  Second Circuit in 1989.

18          I've reviewed the parties' arguments in their

19  sentencing submissions along with the evidence in support of

20  their arguments and independently find by a preponderance of

21  the evidence that the Government has met its burden and has

22  demonstrated that by speaking out, conveying threats on behalf

23  of the Chinese Government to John Doe Two and attempting to

24  get John Doe One to involuntarily to return to the PRC, Mr. An

25  did conspire to knowingly and intentionally harass and

1    intimidate John Doe Two and John Doe One, as alleged in Count

2    Seven of the Superseding Indictment.  As a result, this

3    conduct is conduct that I may consider when sentencing Mr. An

4    under 18 U.S. Code Section 3661.

5            I note that *United States vs. Reese*, 33 F.3d at 166

6    and page 174 is a decision by the Second Circuit noting that,

7    quote, "When determining sentence a sentencing, the Court is

8    free to consider hearsay evidence evidence of uncharged

9    crimes, dropped counts of an Indictment and criminal activity

10   resulting in an acquittal."

11           As an initial matter, it is not disputed that Mr. An

12   met with and spoke to John Doe Two repeatedly between 2017 and

13   2022 regarding the efforts of the PRC to effectuate John Doe

14   One's return to the PRC.  Many of these conversations were

15   recorded, and I've reviewed the transcripts provided by the

16   defense counsel and the Government, as well as the excerpts

17   cited by both parties submissions, ECF 229 is recorded

18   transcripts, ECF 213 is defendant's memorandum, ECF 220 is the

19   Government's memorandum.  During these conversations Mr. An

20   informed John Doe Two, among other things, that the Chinese

21   Government would, quote, "keep pestering them," end of quote,

22   if John Doe One did not return to the PRC.  And that, quote,

23   "they," referring to PRC officials, "will find some things on

24   you non-stop, keep looking for things," end of quote.

25           These threats caused John Doe Two and his family to,

1   quote, "take onerous measures to conceal themselves, changing

2   email accounts, bank accounts, cellphones, and cars," and

3   caused severe emotional and mental distress for John Doe One,

4   John Doe Two and his family members in the United States and

5   in the PRC.

6           John Doe Two's sister, Jane Doe One, also had to

7   quit her job and give up her career in order to care for their

8   father whose health suffered terribly and has remained fearful

9   and in decline.

10          Mr. An's primary argument against consideration of

11  this conduct is that he only discussed threats from the

12  Chinese government with John Doe Two's at John Doe Two's

13  request.  And even so, the Chinese government had already

14  conveyed these threats to John Doe Two without Mr. An's

15  involvement.  Mr. An further argues that he only sought out

16  John Doe Two to try to help resolve the issue and not to

17  threaten him.

18          After reviewing the evidence submitted by the

19  parties, I find that Mr. An's argument attempts to minimize

20  his conduct and ignores the fact that John Doe Two was

21  intimidated and harassed, not just by the PRC's messages

22  conveyed by Mr. An, but by Mr. An himself and his conduct.

23  For example, Mr. An conveyed these threats after telling John

24  Doe Two that he was a member of the Standing Committee of the

25  Chinese People's Political Consultative Conference, also

referred to as CPPCC, of Shandong Province, which enforces the rules of the CCP abroad, and that he was well regarded in the PRC. Informing John Doe Two of his position within the CPPCC at the outset, signaled Mr. An's connection to the PRC government and the significance of the threats that he was sent to convey.

Mr. An acknowledged that, quote, "the central Government wants the first 100 most wanted fugitives to return to PRC, and each province would have its allotted quota as assignment," end of quote. He conveyed the urgency by which the Chinese Government wanted these individuals to return to the PRC saying, "You did not respond to any of the PRC's official's attempts to contact you. They will get more and more egregious. He's doing things by hook or by crook," end of quote.

In another conversation on July 1, 2021, Mr. An conveyed additional threats to John Doe Two that the Chinese Government would, quote, "keep pestering him through a lawsuit." The cost of continuing the frivolous lawsuit, as admitted by Mr. An, was, quote "just a drop in the bucket for a country to spend to meet the political task assigned by the Central Government."

Also, co-defendant Tian Peng, attempted to contact John Doe One in the months before this meeting between John Doe Two and Mr. An. Between November 2019 and December 2019

1   Mr. Peng texted John Doe Five, who was a relative of John

2   Doe's One and Two about connecting Quanzhong An with John Doe

3   One.  In these communications Peng repeatedly asked John Doe

4   Five if he was in touch with John Doe one.  Peng warned John

5   Doe Five that things cannot stay unresolved like this.

6          Mr. An also communicated to John Doe Two on July 1st

7   2021 that it would be, quote, "endless misery" end of quote,

8   for John Doe Two and John Doe One to continue defending

9   themselves.  Mr. An even told him that the Chinese Government

10  would, quote, "definitely find new ways to bother you.  And if

11  you continue like this, it is definitely true that all of your

12  relatives will be involved," end of quote.

13         In another conversation on July 21, 2021, after John

14  Doe Two told Mr. An he was not concerned about the lawsuit,

15  Mr. An pushed back and said, quote, "It will make you feel

16  uncomfortable.  The lawyer will keep calling you and making

17  your life uneasy, to pester you, and to not allow you to have

18  any piece of mind," end of quote.

19         Mr. An then urged John Doe Two to talk to his father

20  to convince him to return to the PRC, threatening that John

21  Doe One should return while they had a window; otherwise, he

22  would have to return no matter what the situation is, no

23  matter how you were dealt with, and the party will use this as

24  a way to demonstrate it's determination to instill discipline

25  for the organization.

1       Mr. An even demonstrated his personal investment in

2  the scheme to involuntarily repatriate John Doe One when

3  during the same conversation he told John Doe Two, quote, "if

4  this matter can be coordinated, well at least they -- meaning

5  the PRC Government -- "would give me recognition.  They would

6  not only recognize what I've done in the past but what I am

7  capable of now," end of quote.  These repeated threats and the

8  admission that Mr. An would benefit if John Doe One would

9  return to the PRC are indicative of Mr. An's personal

10 involvement in the scheme to involuntarily repatriate John Doe

11 One as a member of the CPPCC and his intention to intimidate

12 and harass John Doe One into returning to the PRC through his

13 son John Doe Two.

14       (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

1    (Continuing.)

2              THE COURT:  My conclusion is supported by the victim

3    impact statement by John Doe 2 on behalf of himself and his

4    father, John Doe 1, in which he describes the very terrible

5    impact that Mr. An's actions have had on him and his family.

6    These statements are not in dispute, and I deem them to be

7    credible.  John Doe 2 explains that he had never met Mr. An

8    before Mr. An showed up at John Doe 2's home "uninvited and

9    unannounced" in October of 2017.

10             Thereafter, as I've already described, Mr. An

11   repeatedly demanded meetings with John Doe 2 and conveyed

12   threats that left John  Doe 2 and his family "in a state of

13   distress for more than seven years."  John Doe 2 personally

14   suffered from "anxiety, depression, fear, and insomnia" as a

15   direct result of what he described as the "Ans' harassment

16   campaign."

17             John Doe 2 also credibly explained that Mr. An's

18   "incessant calls, meetings, and threats left John Doe 2's

19   father, John Doe 1, in a state of depression, anxiety, fear,

20   and guilt, coupled with insomnia and nightmares, much like

21   himself.  In fact, on one occasion, John Doe 1 experienced

22   such a powerful nightmare that he was caused to fall out of

23   his bed and injure his head, after which John Doe 2 took his

24   father to the emergency room where he was kept for medical

25   treatment, including psychotherapy and prescription

1  medication."

2          Having considered the evidence before the Court, it

3  defies logic to conclude, as defense counsel has argued, that

4  Mr. An's conduct represents a mere attempt to help and

5  "ameliorate the situation."  The recorded conversations

6  demonstrate, by a preponderance of the evidence, that Mr . An

7  conveyed threatening messages on behalf of the Chinese

8  government, directly pressured John Doe 2 to convince his

9  father to return to the PRC, and admitted that he was doing so

10 because it would reflect well on him and benefit him both

11 reputationally and financially if John Doe 1 returned to the

12 PRC.

13         Accordingly, I find, by a preponderance of the

14 evidence, that Mr. An participated in a conspiracy to threaten

15 and harass John Doe 2 and John Doe 1 as alleged in Count Seven

16 of the superseding indictment, and I can and will consider

17 this conduct at sentencing.

18         Second, Mr.  An objects to paragraphs 51 through 55

19 and paragraph 61 of the Presentence Report that describes the

20 conduct underlying the conspiracy to commit bank fraud, Count

21 Eight, and money laundering in Count Nine, in the superseding

22 indictment.

23         Count Eight of the superseding indictment charged

24 Mr. An and his daughter, Guangyang An, together referred to

25 here as the Ans, with conspiracy to commit bank fraud, in

1  violation of 18 U.S. Code  Section 1344.  Specifically, the

2  indictment charges the Ans with "knowingly and intentionally

3  conspiring to a scheme and artifice to defraud the financial

4  institutions and to obtain monies, funds, credits, and other

5  property owned by and under the custody and control of the

6  financial institution by means of one or more materially false

7  and fraudulent pretenses, representations, and promises."

8  This charge implicates both provisions of the bank fraud

9  statute, Section 1344(1) and 1344(2).

10         For the Government to establish that Mr. An

11  conspired to commit bank fraud in violation of 1344(1), the

12  Government must demonstrate, by a preponderance of the

13  evidence, that Mr. An "entered into the alleged agreement with

14  another person, here allegedly Ms. An, to commit bank fraud,

15  and that Mr. An knowingly and willfully joined that

16  agreement."

17         The agreement to commit bank fraud must have been an

18  agreement to, first, knowingly execute or attempt to execute a

19  scheme to deceive a bank; two, through a misrepresentation or

20  concealment of a material fact; three, and thereby deprive the

21  bank of something of value; and four, with knowledge that the

22  defendant likely would harm the bank's property interest

23  through the scheme.

24         For the Government to establish Mr. An conspired to

25  commit Section 1344(2), the Government must again demonstrate,

1   by a preponderance of the evidence, that Mr. An "entered into

2   an alleged agreement with another person, here allegedly

3   Ms. An, to commit bank fraud, and that Mr. An knowingly and

4   willfully joined in the agreement.  The agreement to commit

5   bank fraud must have been an agreement to deprive the victim

6   bank of money or property.  United States v. Bankman-Fried,

7   680 F.Supp. 3d, 289 at 305, decided by the Southern District

8   in 2023.

9           Count Nine charges the Ans with money laundering

10  conspiracy, in violation of 18 U.S. Code Section 1956.

11  Specifically, the Ans were charged under the provision of a

12  federal money laundering statute that criminalizes the

13  transfer of funds into the United States with the intent to

14  "promote the carrying on of specified unlawful activity."

15  18 U.S. Code Section 1956(a)(2)(A).  As I have already noted,

16  the specified unlawful activity is bank fraud, in violation of

17  both Section 1344(1) and Section 1344(2).  This charge,

18  therefore, depends on the legal validity of the Government's

19  bank fraud theory.

20          Mr. An argues that the Presentence Report should be

21  amended to "note that the funds involved in these alleged

22  crimes were the legal proceeds of the Ans' real estate

23  business in the PRC and were wholly unrelated to the foreign

24  agent and conspiracy to harass charges."  Mr. An further

25  argues that "there is no proof that the Ans intended to

1    deprive anything of value from the banks, a legal element of

2    bank fraud."

3            In the second addendum to the Presentence Report,

4    Probation declined to make any changes to the Presentence

5    Report based on Mr. An's objections.

6            As an initial matter, the fact that the conspiracy

7    to commit bank fraud and money laundering charges are

8    unrelated to the foreign agent and conspiracy to harass

9    charges does not impact my ability to consider the conduct at

10   sentencing.  As we know, 18 U.S. Code Section 3661 provides

11   that no limitation shall be placed on the information

12   concerning the background, character, and conduct of a person

13   convicted of an offense which a court of the United States may

14   receive and consider for the purpose of imposing an

15   appropriate sentence.

16           In United States v.  Reese, 33 F.3d 166, at 174,

17   decided in 1994, the Second Circuit noted that when

18   determining a sentence, a sentencing court is free to consider

19   hearsay evidence, evidence of uncharged crimes, dropped count

20   of an indictment, and criminal activity resulting in an

21   acquittal.  The Court may also consider hearsay evidence,

22   evidence of uncharged crimes, et cetera, as set forth in the

23   Second Circuit's decision in Reese.

24           Where the parties dispute certain conduct, as I have

25   already noted, the relevant question is whether the Government

1    has met its burden to prove this disputed conduct by a

2    preponderance of the evidence.  And again, this is for

3    purposes of resolving the objections.

4          First, Mr. An  argues that I should not consider

5    this disputed conduct at sentencing because the funds at issue

6    were the legal proceeds of his family business in the PRC.

7    Even if that is true, the Government has submitted evidence,

8    which I will discuss shortly, that demonstrates that the Ans

9    moved the money from the PRC to U.S.-based financial

10   institutions and made false representations and omissions to

11   the U.S.-based financial institutions to open accounts, make

12   deposits, and withdraw those funds, which is the central issue

13   in a bank fraud conspiracy charge, both under 1344(1) and (2).

14         Second, Mr . An argues that I should not consider

15   this conduct at sentencing because there's no proof that the

16   Ans intended to deprive the bank of anything of value.  Here,

17   the banks were deprived of something of value because the harm

18   to the banks is the deprivation of deposited funds in accounts

19   held by the victim banks in accounts that were opened under

20   the names of individuals other than Mr. An or Ms. An.  For

21   example, whereas here there's a plan to deprive a bank of

22   money in a customer's deposit account through

23   misrepresentations and concealment of the true owner of those

24   accounts, the Supreme Court has held that this deprivation

25   implicates a property interest.  Shaw v. The United States,

SENTENCE

1    580 U.S. 63 at page 72, decided in 2016.

2            This deprivation of a property interest is different

3    from the deprivation of information that the Supreme Court

4    rejected in United States v. Ciminelli, in which the District

5    Court instructed the jury that it could find a deprivation of

6    property if it found that the victim was deprived of

7    information that affects the victim's assessment of the

8    benefits or burdens of the transaction, or relates to the

9    quality of goods or services received or the coming risks of

10   the transaction.

11           To establish a violation of 18 U.S. Code Section

12   1344, the Government need not allege that the defendant

13   intended the victim bank suffer financial harm.  That's Shaw

14   at 580 U.S. 68.  Loughrin v. United States, 573 U.S. 351 at

15   366, note 9, decided by the Supreme Court in 2014.

16           There is no requirement that the scheme to obtain

17   money or property must "create a risk of financial loss to the

18   bank."  Rather, a scheme to obtain an accountholder's funds is

19   enough because the bank holds a property interest in those

20   funds akin to a bailee.  United States v . Weigand, 482

21   F.Supp. 3d at 224, the pin cite is 234, note 4.

22           Regarding Mr. An's intent, the Government has

23   produced messages between the Ans in which they discuss how to

24   transfer the funds both for the PRC and within the United

25   States between bank accounts held by different U.S. banks

*Kristi Cruz, RMR, CRR, RPR*
*Official Court Reporter*

1  without the bank's knowing the source, owner, or purpose  of

2  those funds.  In one such message, Mr. An asks his daughter

3  whether he can send money to a certain account, and Ms. An

4  responds that they cannot use the accounts that the banks

5  "know about" and can only use accounts that the bank does not

6  know about.  ECF No. 220, Exhibit  D, at AN0018787.

7          In the same conversation, Mr. An asks his daughter

8  whether accounts in the names of two individuals can "receive

9  any more money."  This is also ECF 220, Exhibit D, at

10  AN0018787 .  Seemingly implying that the accounts in the names

11  of two individuals cannot receive any further funds, Ms. An

12  responds that she can have the two individuals open new

13  accounts at a U.S. bank, specifically Cathay Bank.  The next

14  day, Ms. An confirms to Mr. An that the accounts were opened.

15          In another conversation, Mr. An directs Ms. An to

16  contact a family member to transfer funds for Ms. An to use,

17  and Ms. An responds that the transactions need to be completed

18  through the accounts of two different people.  Mr. An responds

19  by sending the information for a Chase Bank account in the

20  name of one of the individuals.  This is Exhibit D to ECF 220

21  at 18806-07.  Thus, it appears that both of the An defendants

22  agreed to use at least two other individuals' accounts to

23  transfer funds.

24          Further, in a message on December 6, 2017, Ms. An

25  lets Mr. An know that a certain sum of money is "missing," and

1    Mr. An  responds that they should be careful with the payee's

2    name, noting "it should be someone from the family in case the

3    relationship with the payee goes sour in the future."  Ms. An

4    responds, "it won't."  That's ECF 220, Exhibit D, at 18780.

5            Further, in a message on July 3, 2018, Ms. An sends

6    Mr. An's screenshot of a message with another individual in

7    which the individual asks, "do you still want to exchange USD

8    50,000 same company?"  Mr. An responds to Ms.  An that they do

9    still want to exchange the money.  That's Exhibit D at 18793.

10           The Supreme Court instructs us that for purposes of

11   the bank fraud statute, a scheme to fraudulently obtain funds

12   from a bank depositor's account normally is also a scheme

13   fraudulently to obtain property from a financial institution,

14   at least where the defendant knew that the bank held the

15   deposits, the funds obtained came from the deposit account,

16   and the defendant misled the bank in order to obtain those

17   funds.  Shaw, 580 U.S. at page 67.

18           Here, the messages between the Ans demonstrate the

19   Ans concealing transactions from the victim banks, misleading

20   banks from opening accounts in the name of other individuals

21   to facilitate those transactions, and withdrawing those funds

22   from the bank's custody.

23           As a result, I find this is sufficient evidence,

24   apart from the allegations in the superseding indictment, and

25   I note that the Government, in responding to these objections,

1    tended to cite mostly the indictment, but the Government has

2    also submitted actual text and transactions, and this

3    evidence, again aside from the indictment citations,

4    demonstrate by a preponderance of the evidence that Mr. An

5    participated in a bank fraud conspiracy, in violation of 18

6    U.S. Code Section 3441.

7           Having reached the conclusion that I have, I find

8    that the Government has also established, by a preponderance

9    of the evidence, that the Ans transferred funds to the United

10   States with the intent to promote the carrying on of the bank

11   fraud conspiracy, in violation of 18 U.S. Code Section 1956.

12          In United States v. Bankman-Fried, 680 F.Supp. 3d at

13   305, the Government sufficiently alleged a bank fraud

14   conspiracy where the defendant allegedly conspired to induce a

15   bank to open an account which was used to receive customer

16   deposits and from which the defendant and his co-conspirators

17   regularly took money from the bank's custody.

18          I made a misstatement, I apologize, earlier.  Let me

19   just restate the misstatement I made.

20          Having reached the conclusions, I find that the

21   Government has established, by a preponderance of the

22   evidence, that the Ans transferred the funds to the United

23   States with the intent to promote the carrying on of the bank

24   fraud conspiracy and the money laundering conspiracy as stated

25   in the indictment.

1    Mr. An argues that there is no allegation that the

2    banks lost any money through the alleged conduct.  This

3    argument is without merit because, as I noted in the May 27,

4    2024 memorandum and order denying the Ans' motion to dismiss

5    certain counts of the indictment, the Supreme Court in Shaw

6    instructs this, that a scheme to defraud requires "neither a

7    showing of ultimate financial loss nor a shoring of intent to

8    cause financial loss."  That's Shaw at 580 U.S. page 67.

9    Having reviewed the parties' arguments in their

10   sentencing submissions along with the evidence submitted in

11   support of these arguments, I independently find, by a

12   preponderance of the evidence, that the Government has met its

13   burden as to the disputed conduct underlying paragraphs 51

14   through 55 and paragraph 61 of the Presentence Report.  This

15   conduct may be considered in imposing Mr. An's sentence.

16   Mr. An makes additional factual objections that the

17   Government does not dispute and Probation has incorporated

18   into the Presentence Report.

19   Is there any other objection that I should consider

20   and deal with?

21   MR. SOLOMON:  Not from the Government.  Thank you.

22   MR. BRAFMAN:  No.

23   THE COURT:  All right.

24   In addition to the conduct I've just described, I

25   will now review the other factual background that led us to

1   this sentencing today.  I will independently then consider the

2   3553(a) factors and Mr. An's Criminal History Category, which

3   I think we all agree is I.

4             In July 2014, the PRC announced an initiative called

5   Operation Fox Hunt which was designed to "locate and

6   repatriate alleged fugitives who fled to foreign countries,

7   including the United States."  The program was run by the PRC

8   ministry of public security and targeted alleged fugitives and

9   their families to compel cooperation and self repatriation to

10  the PRC.

11            Through Operation Fox Hunt, the PRC government

12  officials traveled to the United States without providing

13  notice to the United States Government and utilized assets

14  located in the United States to "surveil and harass Operation

15  Fox Hunt targets."  These PRC government officials and their

16  assets threatened the targets and their family members, both

17  within the PRC and in the United States, with harm, including

18  incarceration, to coerce the target's repatriation to the PRC.

19            In 2002, the PRC began targeting John Doe 1, a PRC

20  citizen residing in the Eastern District of New York, and

21  sought to cause John  Doe 1's involuntary repatriation to the

22  PRC.  John Doe 1 was on the PRC's list of "top 100 priority

23  fugitives as part of the Operation  Fox Hunt."

24            On May 16, 2002, the PRC government caused the

25  International Criminal Police Organization, also known as

1    Interpol, to issue a red notice for John Doe 1 that advised

2    "Interpol member states of a fugitive wanted by the requesting

3    country and containing information about the fugitive 's

4    identity and the alleged criminal conduct."

5            According to the red notice, John Doe 1 allegedly

6    "took advantage of his position as the general manager of a

7    state-owned corporation and embezzled 2  million CNY,

8    approximately 264,961 euros, of public funds for his personal

9    use, in violation of Chinese Criminal Law Article 382, a

10   charge that carried a maximum possible penalty of life

11   imprisonment."  Mr. An acted as a "United States-based asset

12   for the operation" to repatriate John Doe 1 to the PRC and

13   directly interfaced with family members of John Doe 1,

14   including John Doe 2.

15           In 2017, Mr. An and other various co-conspirators

16   pressured John Doe 3, who is John Doe 1's family member who

17   lived in the PRC, to travel with Mr. Yuan, his supervisor in

18   the PRC, to the United States to meet with John Doe 2.  Around

19   this time, John Doe 2 received various messages from family

20   members and PRC officials that urged him to convince his

21   father to return to the PRC.

22           On October 24, 2017, Mr. An visited John Doe 2's

23   residence in Long Island, but did not speak with him.  In

24   December and January 2016 through 2017, John  Doe 3 and his

25   supervisor, Weidong Yuan, applied for tourism Visas to travel

1  to the United States, but these Visas were denied.

2          In August 2018, John Doe 3 and Mr. Yuan again

3  applied for tourism Visas to travel with their wives to the

4  United States as part of a tourist group.  These Visa

5  applications were granted.  The group flew to Chicago,

6  Illinois as part of the tourist group on September 5, 2018.

7  And on September 8, 2018, instead of flying from Chicago to

8  Hawaii, which was the next stop on the itinerary, John Doe 3

9  and Mr. Yuan traveled without their wives to New York.

10          On September 8 and 9, 2018, Mr. An's daughter drove

11 John Doe 3 and Mr. Yuan to John Doe 2's residence in Long

12 Island on two separate occasions to attempt to locate John

13 Doe 2.  And on September 11, 2018, John Doe 2  met John Doe 3

14 and Mr. Yuan at a restaurant in Queens.  During the meeting,

15 John Doe 3 informed John Doe 2, among other things, that PRC

16 officials had "placed pressure on him" to track down John Doe

17 1 and warned John Doe 2 to listen to Mr. Yuan.

18          Mr. Yuan then joined John Doe 2 and 3 in the

19 restaurant meeting and informed John Doe 2 that "he had been

20 tasked to relay the message to John Doe 1 that the leadership

21 in China would like to encourage the elite overseas to return

22 and John Doe 1's issue needed to be resolved sooner or later.

23          On September 11, 2018, Ms. An purchased plane

24 tickets for John Doe 3 and Mr. Yuan to rejoin their tour group

25 in Los Angeles, California.

 1          In August  2019, another co-conspirator, Tian Peng,

 2   sent harassing communications to John Doe 5, who is also John

 3   Doe 1's former son-in-law who resided in the PRC, and informed

 4   him, in part, that the PRC is very serious about hunting down

 5   those who have fled abroad and recovering ill-gotten gains.

 6   Regardless of the price, they undoubtedly will think of all

 7   the possible ways and mobilize all their powers to accomplish

 8   this goal.  Mr. An is a patriotic businessman in the U.S. and

 9   the head of the Chinese  business Association of New York.  He

10   was originally from Zaozhuang, Shandong, and has given strong

11   support to the Government's work.  He is willing to

12   communicate with John Doe 1 and pay for John Doe 1 to help the

13   Government recover the loss without anything in return."  John

14   Doe 5 sent this message from Mr. Peng to John Doe 1 along with

15   contact information for Mr. An.

16          Between November 2019 and December 2019, Mr. Peng

17   repeatedly texted John Doe 5 about connecting Mr. An with John

18   Doe 1.  On December 19 , 2019, a "PRC state-owned corporation

19   that previously employed John Doe 1 initiated a lawsuit

20   against John Doe 1 and John Doe 2 in New York State Supreme

21   Court" alleging John Doe 1 stole money from the corporation

22   and John Doe 2 was aware of and benefited from the scheme.

23          In 2020 and 2022, Mr. An traveled to the PRC.  He

24   received directives from the Provincial Commission and

25   communicated messages from the Provincial  Commission to John

1  Doe 1's family members, including his son, John Doe 2.  Mr. An

2  met with John Doe 2 several times between 2020 and 2022 and,

3  at each meeting, conveyed threats and messages from the PRC

4  government to John Doe 2 to encourage John Doe 1 to return to

5  the PRC.  In these meetings, Mr. An acknowledged that the

6  civil lawsuit that I've already described lacked merit and was

7  filed simply to harass John Doe 1 and 2.

8          On January 23, 2020, Mr. An met with John Doe 2 in

9  Queens, and at that meeting, he informed John Doe 2 that he

10  was a member of the Standing Committee of the Chinese People's

11  Political Consultive Conference of Shandong and that the CPPCC

12  was trying to contact John Doe 1.  Mr. An informed John Doe 2

13  that in 2017, at the direction of the PRC government, he

14  attempted to contact John  Doe 2 at his home in order to

15  locate John Doe 1.  Mr. An informed John Doe 2 that he would

16  pay back the money that John Doe 1 allegedly owed the PRC

17  government, and if John  Doe 1 returned to the PRC, he would

18  not be detained and the civil lawsuit would be withdrawn.

19  Mr. An advised John Doe 2 that the PRC government would keep

20  pestering them if John Doe 1 did not return.

21          On July 1, 2021 Mr. An again met with John  Doe 2 in

22  Queens and again encouraged him to convince his father to

23  return to the PRC.  Mr. An informed John Doe 2 about an

24  individual from Canada who had returned and had the charges

25  dropped against him.  Mr. An also admitted that the civil

1   lawsuit -- or he again admitted that the civil lawsuit against

2   John Does one and two was frivolous and was intended to place

3   pressure on John Doe 1.  He explained that this was "a drop in

4   the bucket for a country to spend 1 billion or .8 billion to

5   meet the political task assigned by the Central Government."

6   Mr. An then showed John Doe 2 a document accusing John Doe 1

7   of embezzling public funds, but informed him that if John

8   Doe 1 returned to the PRC, his punishment may be reduced.

9           On July 20, 2021, Mr. An met with John Doe 2 in

10  Queens and again "reiterated the proposal for John Doe 2 to

11  return to the PRC without the possibility of detention" and

12  informed John Doe 2 that if John Doe 1 did not agree to the

13  proposal, "lawyers in the civil lawsuit would keep calling and

14  make life uneasy."

15          On July 12, 2022, Mr. An again met with John Doe 2

16  in Queens.  John Doe 2 asked if John Doe 1 could return to the

17  United States if he went to the PRC, and Mr. An informed John

18  Doe 2 that John Doe 1 could "apply for such return after

19  several months."  Mr. An warned John Doe 2, though, that if

20  John Doe 1 did not return, "they will find some things on you,

21  nonstop keep looking for things."

22          On July 21, 2022, Mr. An called John Doe 2 and

23  informed him that he would arrange for John Doe 2 to speak

24  telephonically with someone from the PRC government who was

25  working on John Doe 1's case.  The next day, John  Doe 1 met

1  with Mr. An at the Parc Hotel -- I'm sorry, I think that was

2  John Doe 2 met with Mr. An at the Parc Hotel and they called

3  Mr. Peng.  On the phone, Mr. Peng confirmed that he worked in

4  the PRC government and assured John Doe 2 that the proposal

5  Mr. An showed him regarding the disposition of John Doe 1's

6  case would be fulfilled.

7         Mr. Peng also informed John Doe 2 that John Doe 1

8  "would not be detained if he returned to the PRC," and at the

9  end of the conversation, Mr. An said that once the matter was

10  successfully resolved, John Doe 1's family could freely travel

11  to and from the PRC.

12         On August 19, 2022, Mr. An met with John Doe 2 in

13  Queens and gave John Doe 2 the contact information for the

14  individual from Canada who had returned to the PRC and had his

15  or her charges resolved.  Mr. An again advised John Doe 2 that

16  once the matter was resolved, "John Doe 1 would be

17  exonerated."

18         On August 27, 2022, John Doe 2 called the individual

19  from Canada who gave him details on how his case was resolved

20  in the PRC and informed John Doe 2 that "he was neither

21  detained nor mistreated while in the PRC, and he returned to

22  Canada after the verdict."

23         I've tried to compute Mr. An's offense level, but

24  the guidelines make it difficult, or the lack of guidelines

25  make that difficult to do.  For Count Two, acting as an agent

1    of a foreign government, in violation of 18 U.S. Code Section

2    951(a), there is no guideline.  So we look to the most

3    analogous offense, but there is none.  So I rely only on

4    3553(a).

5            For Count Two, acting as an agent of a foreign

6    government, the statutory maximum is 10 years; there is no

7    minimum.  For supervised release, under 18 U.S. Code Section

8    3583(b)(2), the Court is authorized to impose a term of

9    supervised release of not more than three years.  The

10   guidelines note that a term of supervised release shall not be

11   less than the statutorily required term of supervised release,

12   but his offense, the only help we get from the guidelines is

13   that it's a Class C felony, and the guideline range would be

14   one to three years under guideline 5D1.2(a)(2).

15           Mr. An is eligible for not less than one or more

16   than five years of probation under 18 U.S. Code Section

17   3561(c)(1).  Absent extraordinary circumstances, if I impose a

18   sentence of probation, I must also impose as a condition of

19   probation either accompanying a fine, restitution, or

20   community service, as provided in 3563(a)(2).

21           As I noted, under 18 U.S. Code Section 3571(b)(3),

22   the maximum fine for Count Two is $250,000.  There is a

23   mandatory assessment of $100.

24           Probation has assessed that Mr. An does have the

25   financial ability to pay a fine.  I agree with that assessment

1    based on the assets that were disclosed.  Probation notes that

2    Mr. An has a positive total net worth of over $2 million in

3    personal savings and checking accounts.

4            As outlined in the addendum to the Plea Agreement,

5    we have resolved restitution in favor of John Does 1 and 2 and

6    Jane Doe 1 in the amount of $1,276,018.  We will incorporate

7    the restitution order into the judgment.  He will have paid

8    this as of today.  The forfeiture as set forth in the addendum

9    to the Plea Agreement has been amended to $3,723,982 from the

10   original $5 million.  And the remaining balance after the

11   seized assets, including bank accounts, would be $945,340.73,

12   and Mr. An will be paying that amount.  Just make sure the

13   amount is correct.  I think there was perhaps a typographical

14   error.

15           The preliminary order of forfeiture I believe will

16   also become final at the conclusion of today's hearing.

17           Is that correct, Ms. Kedeshian?

18           MS. KEDESHIAN:   Technically it needs to be

19   published, Your Honor.

20           THE COURT:   Well, you'll publish it, then.

21           MS. RANGEL:  We will.

22           THE COURT:  And send me the final order when it's

23   ready.

24           MS. KEDESHIAN:  Yes.

25           THE COURT:  I will attach, for now, the preliminary

1    order of forfeiture to the judgment, and Mr. An I believe will

2    be able to pay the $100 mandatory special assessment.

3            Mr. An, you have the right to appeal your sentence

4    subject to any waiver of your appellate rights in your

5    original Plea Agreement and amended Plea Agreement.  You agree

6    to waive your right to appeal if I impose a sentence of 120

7    months or less.  I take no position whether that is an

8    enforceable waiver.  But in any event, you must file your

9    appeal within 14 days of judgment being entered in your case.

10   I believe you can afford to pay the filing fee, so I will not

11   address in forma pauperis, which if you could establish that

12   you're indigent, you could file your appeal without paying the

13   filing fee.

14           Will Mr. An's counsel please take steps necessary to

15   protect their client's right to appeal and to have

16   representation?

17           MR. BRAFMAN:  Yes, Your Honor.

18           THE COURT:    Thank you.

19           Is there any property that the Government seized

20   from Mr. An that isn't in the forfeited property that should

21   be returned?

22           MS. RANGEL:  One moment, Your Honor.

23           (Pause in proceedings.)

24           MR. SOLOMON:  There are several real estate

25   properties that were seized, so those will be returned, or the

 1  liens will be removed.

 2              THE COURT:  All right.  Is there anything in the

 3  nature of personal property, like phones or diaries or

 4  anything like that?

 5              MR. SOLOMON:  Electronic devices.  So we'll make

 6  arrangements with defense counsel to return those.

 7              THE COURT:  All right.  Thank you.

 8              Now, because I could not really specifically

 9  reference the guidelines, I'm going to discuss the 3553(a)(1)

10  through (7) factors in determining Mr. An's sentence.  First,

11  the nature and circumstances of Mr. An's offense.  I find that

12  they were extremely serious.

13              With respect to Count Two, acting as an agent of a

14  foreign government, it is not enough to simply say he was

15  acting as an agent without registering with the Attorney

16  General without considering Mr. An's conduct as an agent of a

17  foreign government.  Here, he aided the People's Republic of

18  China in its attempt to involuntarily repatriate John Doe 1

19  from the United States, and in furtherance of the scheme, he

20  extensively harassed and threatened John Doe 2 and his family

21  members over the course of several years.  This undoubtedly

22  serious conduct poses a serious threat to our country's

23  national security and disregarded the protocols of the United

24  States for foreign nationals in the United States who are

25  sought by their government.

1    As Judge Chen observed in her sentencing in United

2    States v. Zhu, "These types of crimes are a threat to this

3    country's national security.  There can be no debate about

4    it."

5    As part of the scheme to repatriate John Doe 1,

6    Mr. An showed up unannounced at John Doe's home and thereafter

7    repeatedly reached out.  John Doe 2's home had a video

8    surveillance system which captured the visits; the unwanted,

9    uninvited visits by Mr. An and his daughter.  His daughter was

10   instructed to help two PRC government officials attempt to

11   find John Doe 2 at his residence in 2018.  Again, this attempt

12   was captured on videotape, and certainly reviewing a home

13   surveillance tape that is installed there to ensure security

14   and safety showed conduct that was very concerning.

15   Mr. An reached out thereafter repeatedly to convey

16   threatening messages on behalf of the PRC to John Doe 2

17   regarding their attempts to convince John Doe 1 to return to

18   the PRC.  I've already reviewed and discussed some of these

19   threats and statements that John Doe 2 heard from Mr. An on

20   behalf of the PRC, so I won't repeat them here.

21   As the Government noted, Mr. An's conduct was

22   intended to aid a foreign government in terrorizing

23   individuals living in the United States, and Mr. An admitted

24   that he was doing so, in part, so that his stature within the

25   PRC government would be elevated and that he would experience

1   economic benefits.

2           John Doe 2 submitted his victim impact statement

3   regarding the effect on himself, his father, and their sister.

4   This multiyear campaign of interstate harassment and threats

5   tormented John Doe 1, 2, and Jane Doe 1.  They had to live a

6   life hiding in fear.  They continue to be hounded by the civil

7   litigation Mr. An admitted was frivolous and was brought by

8   the PRC government to harass and intimidate John Doe 1.  Their

9   savings are depleted.  They've had to defend against a

10  frivolous lawsuit.  They've had to move, they've had to change

11  cars, phone numbers, et cetera.

12          John Doe 2 had never met Mr. An before he showed up

13  at his house in 2017.  He states that even if Mr. An spoke in

14  flowery language about helping his father, that language was

15  thinly veiled threats.  John Doe 2 explained the impact of his

16  conduct and the mental health suffering that both John Doe 1

17  and John Doe 2 suffered.

18          John Doe 1 and 2 have completely withdrawn from

19  their contacts, their social obligation, for fear that they

20  would be endangered and that others who associated with them

21  would be in danger.

22          John Doe 1 has gone to the ER for injuries to his

23  head after he fell out of bed from a nightmare.  He had to

24  receive psychotherapy and prescription medication, and he has

25  suffered a rapid deterioration of his health.  And I am very

1   sympathetic for Mr. An 's condition, health conditions, but I

2   cannot ignore the health suffering that that John Doe 1 and

3   John Doe 2 have suffered, both mental and physical.

4           John Doe 2 also suffers anxiety, depression, fear,

5   and insomnia and experiences headaches, difficulty

6   concentrating, and anger and fear.  John Doe 2 has also

7   withdrawn from his friends and family and social events.  He's

8   been forced to shut down his company, and he has taken onerous

9   measures to conceal himself.  This has depleted their

10  finances.  His sister has had to quit her job.

11          Their family in China has suffered from threats,

12  detention, surveillance, and travel restrictions.  John

13  Doe 1's ex son-in-law has been restricted from traveling, he's

14  been threatened, he's been asked to convey threats.  John

15  Doe 3 has been pressured to come to the United States and try

16  to convince John Doe 1  to return to the PRC.  And it's clear

17  that Mr.  An's conduct and role in the PRC Government's

18  Operation  Fox Hunt has had a severe, detrimental impact on

19  the lives of John Doe 2, John Doe 1, and their families.  This

20  is conduct that I must consider at sentencing.

21          I've considered Mr. An's role in the charged bank

22  fraud and money laundering conspiracy.  I understand that he

23  stands not convicted of those offenses.  It is, nonetheless,

24  concerning, particularly concerning the multitude of false

25  representations that Mr. An made to financial institutions as

1  part of his bank fraud and money laundering schemes.  This

2  conduct continued over the span of many years and demonstrates

3  a troubling lack of respect for the law.

4          I've considered Mr. An's personal characteristics

5  and family history and circumstances.  I find those to be

6  compelling, and I think Mr. Brafman aptly described Mr. An's

7  life in the United States as realizing the American dream.

8          Did you not say that, Mr. Brafman?

9          MR. BRAFMAN:  Some were in our submissions, Your

10 Honor.

11          THE COURT:  Yes.

12          Mr. An was born in 1966 in Shandong Province, China.

13 He's the eldest of five  siblings who were raised by his

14 father, Xu Sheng An, a retired minor, and his mother, Guan Lan

15 Ma.  Growing up in China was difficult for Mr.  An and his

16 family because Mr. An's parental grandfather was a member of

17 the Nationalist Party during the Chinese Revolution of 1949.

18 After the Chinese Communist  Party gained power, they targeted

19 counter-revolutionaries to the Communist Party, like Mr. An's

20 grandfather.  He was removed from his job as a miner  and

21 forced into farm labor.  His father was also removed from his

22 job as a teacher and was sent to work in the mines.  Mr. An

23 and his family were forced to live in a dilapidated home and

24 survive off of rationed food.

25          Mr. An was also forced to watch denouncement

1   meetings, and in one such meeting he witnessed his paternal

2   grandfather suffer from physical assault after being accused

3   of being a counter-revolutionary to the Communist Party.  His

4   mother, Guan Lan Ma, committed suicide when Mr. An was only 18

5   years old because she could not bear the stress of the

6   family's public humiliation due to being viewed as

7   counter-revolutionaries.

8           I know that this was a very difficult time not just

9   for Mr. An, but for his country.

10          Mr. An has reported, though, that he has a close

11  relationship with his father, and despite the mental and

12  emotional anguish that he experienced related to the

13  conditions in China following the revolution, he also reported

14  a childhood devoid of any form of abuse or neglect.

15          After his mother's death, Mr. An took on the

16  responsibility of caring for his family.  I've read the

17  letters of support submitted by Mr . An's family members,

18  which were compelling, and included a letter from his

19  daughter, from Yuanyuan Yuan, who wrote, "at a very young age,

20  Mr. An took on the responsibility of caring for his whole

21  family, including his younger brothers, after my grandmother

22  passed away.  He treats the younger siblings like his own

23  children, giving them all he has, including minimal food, even

24  if it means he has no food for himself."  And I think she was

25  referencing their life in China.

1          Mr. An has six children ranging from ages 12 years

2     old to 36 years old, and financially supports at least two

3     former wives and his current wife.  His children's letters of

4     support depict a caring and present father figure who provides

5     both financial and emotional support.  His daughter, Yuanyuan

6     Yuan, describes him as someone who has always been devoted and

7     loving and who places family above all.  Ms. Yuan explains

8     that Mr. An has always put the family's needs before his own.

9     He has been the backbone of their family, and is someone who

10    they can rely on for emotional and financial support.

11         His son, Guangya, describes Mr. An as an icon in his

12    heart and a fearless, selfless role model who always saved the

13    best for his children.  He explains that his father is

14    irreplaceable and is a stabilizing force in his family's

15    lives, bringing them endless warmth and support.

16         His 14-year-old son also wrote a letter in support

17    of his father, describing him as exceptionally kind and

18    dedicated, who anticipates the needs of others and offers to

19    help without being asked.

20         His youngest child, who is only 12 years old, wrote

21    a letter in support of her father, noting that he has always

22    been a source of strength and support for their family, and

23    that he has created a nurturing environment for her education.

24         His ex-wife, Meijuan Yang, and mother of two  of his

25    children, wrote in Mr. An's support and explained how even

1    after they divorced, Mr. An generously supported her when she

2    suffered from kidney failure, and he has continued to care for

3    her wellbeing and that of her family as a friend.  Ms. Yang

4    explained that Mr. An "frequently checks on her health and

5    ensures her sons are informed of her condition."  She also

6    explained that Mr. An helped her niece and nephew when her

7    sister went through a divorce and generously offered her

8    accommodation, frequently arranging for his brothers to

9    deliver food and school supplies for the children, and

10    assisted with the transfer of her son to a different school.

11           Mr. An still lives with his ex-wife, Xilin Song,

12    with whom she has two children, ages 12 and 14.  Ms. Song

13    wrote a letter of support for Mr. An and explained that they

14    cohabitate despite being divorced so that they may

15    successfully co-parent their young children.  She writes that

16    Mr. An --

17           THE INTERPRETER:  The interpreter microphone is out

18    of battery.

19           THE COURT:  Okay.  I'm going to take a break too.

20    We'll take a quick break.  Five minutes, please.

21           (Recess was taken.)

22

23

24

25

1              (In open court.)

2         THE COURT:  Have a seat.

3         MS. RANGEL:  Your Honor.

4         THE COURT:  Yes.

5         MS. RANGEL:  The Court had asked the Government to

6    inquire with the Bureau of Prisons regarding certain things

7    related to medical treatment at various facilities.  And so, I

8    thought it might be the opportunity to discuss those.

9         THE COURT:  All right.  Why don't we do that before

10   we go back on the record, I mean, before we continue with the

11   sentence.

12        MR. BRAFMAN:  On that point, if I can have 48 hours

13   just to get your Honor a letter where I can ask you to

14   recommend the designated facility.  It might be the same

15   conditions.  I'll just find out what facilities are available.

16        I'll call you and let you know.

17        MS. RANGEL:  Sure.

18        Just to update is that BOP staff has a medical

19   designator that examines each inmate's medical needs.  And, if

20   necessary, designates them to a federal medical  facility.

21   And then BOP is able to administer infusions  that Mr. An

22   takes.  And I've conferred  with defense counsel what those

23   infusions were, asked the BOP, and they confirmed that they

24   have other defendants who regularly receive the infusions as

25   well as colonoscopies.  And FMCs, Federal Medical Centers,

1   house inmates of all security designations.  So if he were to

2   be designated to a low or a high facility, there would be an

3   FMC to accommodate him.

4            THE COURT:  All right.  That's good to know.  Thank

5   you.

6            And you wanted 48 hours?

7            MR. BRAFMAN:  I'll submit a letter where I ask you

8   to recommend a particular facility.  We'll talk to the Bureau

9   of Prisons.  And if it's accurate, I don't doubt them, we'll

10  just submit a letter, okay, if there is an incarceratory

11  sentence.

12           THE COURT:  All right.  I mean, I understand that

13  his medical condition is not only painful but, you know,

14  raises concerns about his regular treatment.  But the BOP is

15  capable of caring for him which is -- I appreciate your

16  confirming that, Ms. Rangel.

17           I'm going to try to start where I left off.

18           Mr. An lives with his ex-wife Xilin Song, with whom

19  he has two children, ages 12 and 14 and they lived together to

20  better support and jointly parent their children.  Ms. Song

21  writes that Mr. An's words of encouragement to their children

22  have played a significant role in supporting their school

23  studies, helping them not only to achieve high scores at

24  school but also thrive in extracurricular activities

25  especially ballet, piano, golf, and community-organized

1   events.  These letters clearly demonstrate Mr. An's commitment

2   to and love for his family and their love for him.

3            I've also reviewed letters of support from members

4   of Mr. An's community.  Mr.  An's friends describe him as

5   someone who strives to give back to his community.  Mr. An's

6   friend, Kevin Shyu, writes that after he learned that the

7   village he grew up in in China was struggling financially,

8   Mr. An arranged for the construction of approximately 100

9   houses for his former neighbors at no cost to them in order to

10  help them raise their standard of living.  Mr. An also made

11  donations and organized relief efforts during the COVID -19

12  pandemic and is the founder and largest donor to the Confucius

13  Education Foundation, a non-profit charitable organization

14  that has distributed more than $1 million to more than 1,000

15  needy students.

16           By all accounts, Mr. An is a caring person both

17  within his family and his greater community both here in the

18  United  States and in China.  A letter from an international

19  student, Yichi Zhang, I this is the one mentioned by

20  Mr. Brafman describes how Mr. An supported her transition to

21  New York and served as a beacon in New  York providing her

22  with much care and support.  Mr. An also served a mentor to

23  those seeking to start their own businesses and find success

24  in a new environment far from home.  Mr. An showed heartfelt

25  concern for Mr. Xiaping  Wu for his business offering valuable

1  advice and sharing pictures of successful restaurant designs

2  that he had seen to inspire him.  He's not only a successful

3  businessman but also a caring mentor who has shared many

4  invaluable insights into business operations.

5          There are many or letters but in the interest of

6  time I'll just assure everybody that I've read those letters.

7          I've considered Mr. An's health and need for medical

8  care.  Since 2021, Mr. An has suffered from ulcerative colitis

9  and stress gastritis.  When he was arrested, he was detained

10  at MDC.  However, as Mr. An's condition worsened and he was

11  unable to receive sufficient medical care despite my orders at

12  MDC, the Government consented to Mr. An's release in May 2023

13  .  Since he was released, Mr. An has remained in compliance

14  with his conditions and has sought treatment.  His doctors

15  have advised that Mr. An suffers from Crohn's Disease,

16  colitis, and a painful thyroid lesion and has developed other

17  problems which his doctors recommend treating with frequent

18  thyroid ultrasounds and function tests as long as long-term

19  specialized treatment, including regular IV infusions and

20  colonoscopies.

21          I don't believe the seriousness of his medical

22  condition is in dispute.

23          Am I correct, Mr. Solomon or Ms. Rangel.

24          MR. SOLOMON:  That's correct.

25          THE COURT:  Mr. An's doctor writes that it is

1    crucial to ensure proper rest, maintain a healthy diet and

2    stay relaxed without stress because, otherwise, it may worsen

3    the condition and pose a threat to his life.

4           The Government does not dispute the assertions of

5    those who have written letters in support of Mr. An, but does

6    dispute whether Mr. Ans medical conditions warrant leniency in

7    his sentence.  The Government argues that Mr. Ans condition is

8    not so extraordinary that the Bureau of Prisons, quote, could

9    not accommodate them and cites to several cases in support of

10   this argument.  For example, the Government cites to Rita v.

11   United States, 551 U.S. 338, 360 (2007), in which the Supreme

12   Court affirmed the reasonableness of the sentence in part

13   because the sentencing court, quote, explicitly [took] health

14   into account by seeking assurance that the Bureau of Prisons

15   [would] provide appropriate treatment.  The Second Circuit has

16   also affirmed a district courts sentence where a defendant

17   suffered from a serious cardiac condition, but the record

18   supported the fact that the condition could be treated as

19   effectively in prison as out of prison.  Here, the Government

20   represents that Mr. Ans medical

21   conditions are not so extraordinary as to warrant a

22   non-custodial sentence.

23          I note that the MDC conditions are terrible.  I've

24   considered those terrible conditions and the lack of medical

25   care that Mr. An suffered.  I think that those warrant a

1    discount off of his sentence.  Many judges including myself

2    have gone below the guidelines here we have taken the terrible

3    conditions at the MDC into account in determining a sentence.

4    He will not be sent to MDC, he will be designated to a

5    facility if he is sentenced to prison.

6              And, as I said, Ms. Rangel has confirmed he can

7    receive the treatment that his doctor has recommended.

8              I've considered the need for the sentence to -- that

9    I impose to reflect the seriousness of the offense which we've

10   already described to promote respect for the law and I've

11   noted that there have been numerous instances where it appears

12   that there has been a lack of respect for the law and also to

13   provide just punishment, afford adequate deterrence both

14   individually to Mr. An, who I believe is sincerely remorseful,

15   and has been deterred from further offenses.

16             There is the aspect of general deterrence which I

17   think is important to consider especially given the widespread

18   reach of the PRC and its Operation Fox Hunt not only within

19   the United States  but in Canada and elsewhere around the

20   world and I must impose a sentence that avoids unwarranted

21   sentencing disparities.

22             Mr. An's expression of remorse in the letter that he

23   wrote and in his statement today did discuss how sorry he is

24   and the remorse he feels toward those that he let down.  I

25   also believe, although he didn't say it , that there's some

acknowledgement of the harm he did do to his victims.  I make

that determination based on his agreement to pay restitution.

And if he wasn't fully aware of the harm that he was causing

by his actions, I believe he is now.

I've considered the need for deterrence, both

specific and general, and I find, as I said, Mr. An is a

58-year-old first-time offender with chronic health issues is

likely to be deterred and I find him to be genuinely

remorseful.

The pronounced need for deterrence with regard to

Operation Fox Hunt  individuals who might be engaging in this

activity, similar activity, to forcefully repatriated people

to China, there is a deterrent factor that is considered.

Indeed, just earlier this year, a defendant was

sentenced in this courthouse for conduct in violation of 18,

United States Code, Section 951 that was seemingly related to

Operation Fox Hunt.  In United  States versus Zhu , Judge Chen

sentenced a defendant to 24 months in custody for conduct

related to Operation Fox Hunt and citing the defendant's age,

mental health issues, and fact that he did not maybe

appreciate as well as Mr. An does how much harm he was causing

she gave him a downward variance so 24 months was after a

downward variance.

There are other cases pending in our district and

elsewhere in the United States involving Operation Fox Hunt.

1    And with this in mind, there is merit to the Government's

2    argument that Mr. An's sentence should serve as a general

3    deterrent, particularly, in light of the seriousness of his

4    conduct and a threat, if posed, to this country's national

5    security and the harm that was caused to the victims.

6              I've also considered the need to avoid unwarranted

7    sentencing disparities.  And in arguing for a sentence of

8    60 months, the Government cites to United States v. Alvarez in

9    which the Government pleaded guilty to conspiracy to act as an

10   illegal foreign agent and was sentenced to 16 months of

11   imprisonment.

12             We talked about those cases and both Alvarez and the

13   lead case in Alvarez the lead defendant was sentenced to a

14   substantial sentence of 60 months and in Li, the defendant was

15   sentenced to 48 months after being convicted of 18, United

16   States Code, Section 951.  And then we have Judge Chen's

17   sentence of 24 months in her case.

18             I accept that Mr. An, unlike Mr. Zhu, pleaded guilty

19   and admitted his conduct and accepted responsibility.  Unlike

20   Mr.  Zhu who proceeded to trial and was convicted.  Again, I

21   give Mr. An credit for seven months in harsh pretrial

22   detention at MDC.

23             Mr. Zhu was found by the judge there not to be a

24   sophisticated person who, for whatever reasons cognitively, he

25   failed to understand or appreciate the gravity of what he was

1  doing.  And that Mr. Zhu should not be cited in an effort to

2  avoid unwarranted sentencing disparities because there were so

3  many personal factors in that case that were at play.

4         By contrast Mr. An is wealthy, he's accomplished,

5  he's educated, he's successful, he's well regarded, not just

6  here in the United States in his community but in China as

7  well.  Within the PRC leadership, he holds an exalted place

8  and that's both within the provincial and national-level

9  leadership.

10         I've considered all these factors in determining

11  Mr. An's sentence.

12         The probation department, these are the recommended

13  sentences or the requested sentences.

14         Probation recommends 36 months in custody plus two

15  years of supervised release with certain special conditions

16  and the $100  mandatory special assessment.  The requested

17  special conditions are as follows:

18         That the defendant not have contact any victim of

19  the instant offenses.  This means that the defendant shall not

20  attempt to meet with, contact directly or indirectly,

21  communicate through any other person or directly by letter,

22  phone, or through a third- party without the knowledge and

23  permission of the U.S. probation officer and the United States

24  Attorney's Office.

25         The defendant must cooperate with, and abide by, all

1   instructions of immigration authorities.  And if he is

2   deported or excluded, he may not reenter the United States

3   illegally.

4           The Government argues that Mr. An should receive a

5   sentence of 60 months in custody which would be sufficient but

6   not greater than necessary to achieve the goals of sentencing

7   in this case, particularly, given Mr. An's central role over

8   the period of many years in the PRC government's campaign  to

9   force John Doe 1 to involuntarily repatriated to the PRC.

10          Mr. An has agreed in his agreement, agreements I

11  should say, that he would not challenge a sentence of less

12  than 120 months.  Defense counsel requests a sentence of time

13  served with a period of supervised release.  In his sentencing

14  submission, defense counsel highlights Mr. An's law-abiding

15  and successful life prior to the instant offense.  In

16  particular, his history of good deeds and charitable works.

17  They go beyond merely monetary contributions and are instead

18  admirable contributions of his time and energy all of which

19  has benefited other people and I have considered that.

20          Further, defense counsel urges the  Court to

21  consider the impact of Mr. An's serious and debilitating

22  colitis and painful thyroid lesion that would pose a threat to

23  his life should he be sentenced to additional prison time.

24          Defense counsel cites to Mr. An's significant role

25  in his children's lives, both the young ones and the adult

1    children.  And, in particular, his two youngest children with

2    whom he still lives and who rely on him for emotional and

3    financial support.  Defense counsel further notes that Mr. An

4    accepted responsibility by pleading guilty and has no prior

5    criminal record.  Factors which would have been taken into

6    account had I calculated his guidelines but I certainly them

7    take them into account in applying the 3553(a) factors as

8    well.

9           I also take into account the fact that he has paid

10   in full or will have paid in full his forfeiture and his

11   restitution obligations.

12          After giving respectful consideration to the factors

13   set forth at 3553(a) and the comparable cases cited by the

14   Government and by Mr. An in their sentencing submissions, I

15   will impose a custodial sentence that is sufficient but not

16   greater than necessary to meet the goals of sentencing.

17          I cannot overstate the seriousness of Mr. An's

18   offense, particularly, given the lasting emotional, physical,

19   and financial harm that it has inflicted on John Doe 1, 2, and

20   3 and Jane  Doe 1 to operate as a foreign agent in the United

21    States is extremely serious and concerning behavior.

22          Mr. An's conduct presents a serious threat to this

23   country's national security.  That cannot be in debate as

24   Judge Chen noted.  I recognize, though, that Mr. An had a

25   difficult childhood in which he witnessed the Chinese

1  Communist government officials subject his paternal

2  grandfather and members of his family not only to public

3  humiliation but also physical assaults.  And his mother's

4  trauma witnessing this treatment by the Chinese government and

5  her death by suicide.

6          I also recognize Mr. An's admirable work within his

7  community helping young people finding jobs, feeling at home

8  in a new community, and getting education as well as his

9  important role as a father figure to  all of his children to

10 whom he provides financial and emotional support.

11         I considered the fact that he has accepted

12 responsibility as reflected in his guilty plea and his

13 compliance with the terms of his pre-trial supervision.  I've

14 also considered the harsh conditions at MDC to which he was

15 subject between October 20, 2022, and May 25, 2023.  These had

16 detrimental impacts on his health.

17         Based on this record, I find that the custodial

18 sentence that I will impose sufficiently meets the goals of

19 sentencing, of punishment, deterrence, instilling respect for

20 the law, protecting the public, and avoiding sentencing

21 disparities.

22         I sentence Mr. An to 20 months in custody on Count

23 Two; the maximum term of incarceration is ten years.  He will

24 receive credit for time served between October 20, 2022, to

25 May 25, 2023.

1          I'd like to discuss be a surrender date, if I may?

2    We can assume that it will take six weeks.

3          MR. BRAFMAN:  Your Honor, I will let you know in a

4    letter once I understand the designation process.  It usually

5    takes at least six weeks to be designated.

6          THE COURT:  Can we set a date as a control date now

7    and then I'll leave open the designation.

8          MR. BRAFMAN:  Yes, that's fine.

9          THE COURT:  All right.  So when would he like to

10   surrender?

11         MR. BRAFMAN:  Some time in May?

12         THE COURT:   Will he self-surrender or will he

13   surrender here?

14         MR. BRAFMAN:  I'll work out that he surrenders to

15   the institution.

16         THE COURT:  Okay.  Today is March 19th.  So how

17   about Monday, May 19th?

18         MR. BRAFMAN:  Okay.

19         THE COURT:  And I would like Mr. Brafman to please

20   write me a letter to confirm that has surrendered to the

21   designated institution.  I believe you must do so by 2:00

22   p.m.

23         MR. BRAFMAN:  Okay.

24         THE COURT:  All right.  So I'll hear from you on

25   May 20th confirming the surrender.

1          MR. BRAFMAN:  Yes.

2          THE COURT:  All right.  He will serve three years of

3    supervised release on Count Two; the maximum amount.

4          Now, due to the nature of his offense, he shall not

5    have any contact whatsoever with any victim of the instant

6    offense and he shall not make any attempts to contact, meet,

7    or  communicate with any of those victims.

8          Due to his status as a permanent resident in the

9    United States, he shall cooperate with, and abide by, all

10   instructions by immigration authorities.  And if he is

11   deported or excluded, Mr. An may not reenter the United States

12   illegally.

13         The forfeiture money judgment as we discussed will

14   be incorporated into the judgment first as a preliminary order

15   of forfeiture and then as a permanent order of forfeiture.

16   The total amount is $3,723,982.

17         Similarly, the restitution order will also be

18   incorporated into the judgment with payment in full as of

19   today.  I'll note that, in fact, I get confirmation that it

20   has been paid in full at the clerk's office.

21         MR. BRAFMAN:  I've been asked by Ms. Kedeshian to

22   send in the correct amount on the check tomorrow morning which

23   we'll do.

24         THE COURT:  But what about the restitution?  Can we

25   get that filed today, Ms. Kedeshian?

1          MR. BRAFMAN:  If they have documentation from the

2    Court, but it usually takes, you know, an hour or two  unless

3    you give me some paperwork.

4          THE COURT:  I have the order of restitution.

5          MR. BRAFMAN:  All right.

6          THE COURT:  Is that good enough for you?

7          I mean, the clerk's office can accept the

8    restitution and give you a receipt.

9          MR. BRAFMAN:  Okay.

10          THE COURT:  Would you be able to take dare of that,

11   Ms. Kedeshian, at least for the restitution part of this.

12          MS. KEDESHIAN:  My understanding, your Honor, from

13   our financial litigation unit is the restitution needs to be

14   paid directly to the Clerk of Court not to me.

15          MR. BRAFMAN:  Your Honor, it has to go to the Clerk

16   of  the Court.  But it's -- given the time if they don't have

17   paperwork, you know, they're going to not know what to do.

18          COURTROOM DEPUTY:  I'll call down.

19          MR. BRAFMAN:  You'll call down?

20          COURTROOM DEPUTY:  Yes.

21          THE COURT:  I would like a little cooperation.  I

22   don't think it was a big ask.  But if you don't want to do it,

23   it's fine.

24          Let them know that I don't think she should.  The

25   names of the victims are sealed.

 1                MR. BRAFMAN:  I'm sorry.

 2                THE COURT:  The names of the victims are sealed.

 3                MR. KAPLAN:  I'll take it down.

 4                THE COURT:  Is the victims' lawyer here?  Does he

 5     mind?

 6                So why don't we take the check and the order down to

 7     the clerk and get it at least logged in for today.

 8                Interest should not be accruing on that, you know,

 9     given that you're paying it immediately.

10                MR. BRAFMAN:  Yes, your Honor.

11                THE COURT:  But, otherwise, interest would accrue.

12                (A brief pause in the proceedings was held.)

13                THE COURT:  I'm going to continue if you're ready.

14                The restitution order along with the check in the

15     amount of $1,276,018 is being deposited today with the clerk's

16     office.  Ms. Jackson will give you a receipt and we will

17     proceed from there.

18                Now, the maximum fine in this case is $250,000 under

19     18, United States Code, under 3571(b).

20                Count Two, as we know, is not referenced  to a

21     specific guideline and there is no sufficiently analogous

22     offense in the guidelines.  Probation has assessed, though,

23     that Mr. An can pay a fine.  The Court agrees.

24                Probation knows that Mr. An has a significant

25     positive total net worth including over $2 million in personal

1   savings and checking bank accounts.

2          Accordingly, I will impose a fine of $50,000 and I

3   reference that the Court shall impose a fine in all cases

4   except where the defendant establishes that he is not able to

5   pay and is not likely to become able to pay a fine.  The fine

6   is due and payable immediately and that is also a condition.

7   It will be a condition that we pay -- that if he can pay that

8   in a lump sum, interest will not accrue.

9          MR. BRAFMAN:  50,000?

10         THE COURT:   Yes, 50,000.

11         He must also pay a $100 mandatory special assessment

12  for one count of conviction.

13         Is there anything else the parties would like to

14  raise in addition to dismissing the charges that are pending.

15         MR. SOLOMON:  I believe that's the only other matter

16  and, at this juncture, the Government moves to dismiss the

17  remaining counts from the superseding indictment and the

18  underlying indictment as well.

19         MS. RANGEL:  While your Honor did go through a

20  recitation of your findings with respect to the PSR, I don't

21  think that you expressly adopted it  so we ask you do it for

22  the record.

23         THE COURT:  I do adopt it .  The Government, despite

24  the objections of the defense, has established by a

25  preponderance that the facts reported that are in dispute are

1  established and I will adopt the PSR from Mr . An as stated.

2          MS. HARRIS:  Your Honor, I apologize.

3          THE COURT:  Can you wait one minute, please.

4          I just want to make sure.  I've got those remaining

5  counts.  I'll make sure that I place those in the judgment.

6          All right.  Go ahead, Ms. Harris, sorry.

7          MS. HARRIS:  Obviously, I'm not a party to this

8  proceeding so I just ask permission to speak on behalf of

9  Ms. Angela Ann who is obviously the co-defendant and will be

10  sentenced by your Honor in a separate proceeding.

11          I just want to register in this proceeding a

12  procedural objection to the extent that there are findings

13  with respect to the money laundering and bank fraud charges

14  that the Court has made in this proceeding that will be

15  binding on Ms. An without our full objections which go beyond

16  the objections made by Mr. An's counsel being fully addressed.

17          I just, as a procedural objection, obviously, I

18  don't know to what extent those findings will bear or affect

19  Ms. An's sentence that is yet to be determined.  But to the

20  extent it's later said, oh, wait you should have stood up and

21  Mr. An seen and said something, I just wanted to make --

22          THE COURT:  I would not have said that to you,

23  Ms. Harris, because this is a sentencing of Mr. An, not

24  Ms. An.  You will be fully heard.  All of your submissions

25  have been fully reviewed.  I will address each of your

1   objections; the Government will respond.  She will have her

2   full process when her sentencing is scheduled.

3          I think, given the length of time that this sentence

4   has taken, and I would just say that before we adjourn on

5   Mr. An's sentencing, I would appreciate being able to adjourn

6   Ms. An's sentencing.

7          But before we decide that factor, is there anything

8   else I need to address from either party?

9          MR. BRAFMAN:  Just in terms of the timing on the

10  payment of fine, can we have until Monday to pay the fine?

11         THE COURT:  Yes, of course.

12         MR. BRAFMAN:  Okay.  Thank you.

13         THE COURT:  So I'll note that it's due and payable

14  by Monday.  And when I put these monetary sanctions in the

15  judgment, I will note that Mr. An has paid in full if that is,

16  in fact, the case.

17         MR. BRAFMAN:  Thank you.

18         THE COURT:  All right.  Is there anything else

19  anyone wants to raise with me?

20         MR. SOLOMON:  Not from the Government.  Thank you.

21         THE COURT:  Mr. Brafman, anything?

22         MR. BRAFMAN:  No, your Honor.

23         THE COURT:  We're adjourned on Mr. An.

24         May I address the sentence of Ms. An ?

25         MS. HARRIS:  Yes, your Honor.

1          THE COURT:  Her sentencing is likely to take almost

2     as long as Mr. An's.

3          MS. HARRIS:  We're fine proceeding on a different

4     day.

5          THE COURT:  We will be covering a lot of the same

6     ground, and so, I know that they wanted to be sentenced

7     together.  But I think that if we were to proceed for another

8     four and three  quarters hours it would just get too late.

9          MS. HARRIS:  No, we consent and join in your

10    proposal, Judge.

11         THE COURT:  My problem is this:  I won't know until

12    Friday whether I'm going to start a two-week trial next week.

13    And so, if we're not going to trial next week, we can schedule

14    the sentencing for next week.  And if we are going to trial

15    next week, we need to schedule it into mid-April.

16         MS. HARRIS:  That's fine, Judge.  I don't mind, on

17    behalf of Ms. An, being flexible in terms of scheduling.  I

18    think we have some scheduling issues as well.  Perhaps we

19    could just confer with the Government and wait for the Court's

20    availability and then come back to the Court with mutual times

21    that work for all the parties.

22         THE COURT:  Are there dates next week when you

23    cannot be present?

24         MS. HARRIS:  Your Honor, I have a team of lawyers; I

25    want to check with my client.  So it would be, perhaps given

1    everything that's happened today, I think we would like to

2    just take a minute to confer and figure out how much time we'd

3    like.

4              Is that possible?

5              THE COURT:  Yes.

6              MS. HARRIS:  Okay.

7              THE COURT:  So you'll get in touch with us --

8              MS. HARRIS:  Yes.

9              THE COURT:  -- after conferring with the Government.

10             MS. HARRIS:  If that's acceptable.  Exactly.

11             MS. RANGEL:  I think we should have a control date

12   if your Honor is free next week.

13             THE COURT:  I won't know until Friday afternoon.

14             MS. RANGEL:  We can check in with chambers.

15             THE COURT:  It's a little complicated.  It's not me,

16   it's one of the defense lawyers fractured her arm and is

17   seeing an orthopedist Friday to determine whether she'll have

18   surgery next week.  If she's not having surgery, I would like

19   to proceed even though her dominant arm is going to be

20   immobilized.  But if she is having surgery then, obviously, we

21   won't proceed next week with the trial and I can schedule

22   Ms. An.

23             So if you want to tell me your availability next

24   week, or two weeks after that would bring us to the week of

25   April 7th.

1      MS. HARRIS:  May I have one moment, Judge?

2      MS. RANGEL:  The Government is available all next

3 week except for the 27th it is our preference if we can

4 schedule one of the dates.  And to the extent that your Honor

5 is unable to do it because trial is proceeding then we can go

6 for a later date after the trial concludes.

7      MS. HARRIS:  Your Honor, if we're just setting a

8 control date for now, I would prefer to set the April date

9 because we have an -- among our team, we have a number of

10 moving parts that we have to check on for next week.  So we

11 can set April if next week opens up.  And if it turns out

12 there's mutual availability, then we can move it up if that's

13 what all the parties can do but the week of April  7th.

14      THE COURT:  So is there no availability next week?

15      MS. HARRIS:  We don't.  Literally, Ms. Moe doesn't

16 have her calendar with her right now, your  Honor, and so

17 if --

18      THE COURT:  Who is going to be speaking at Ms. An's

19 sentencing?

20      MS. HARRIS:  I will be, your Honor.

21      THE COURT:   I mean, I understand that they all

22 played important roles.

23      MS. HARRIS:  Your Honor, I would ask -- I mean, if

24 given how much time has passed, and actually, I never made a

25 request to be sentenced together for the same day.

1          THE COURT:  I thought you had.

2          MS. HARRIS:  Originally, we wanted to  several weeks

3     apart and I had put a letter on the docket to that effect, so

4     there may have been a misunderstanding on that issue.

5          THE COURT:  We have always put these together

6     understanding that that is what the parties wanted.  But be

7     that as it may, now that you've clarified --

8          MS. HARRIS:  So there's no urgency with respect to

9     that particular timing issue on our part.  And I think, you

10    know, if the Court wants a date next week, I'm happy by the

11    end of the  day tomorrow to put in our availability next week

12    so you have it when the Court knows if the Court is available.

13         THE COURT:  What I can do is I'll know by

14    2:00 o'clock on Friday.  The doctor's appointment is on Friday

15    morning.  I will get a letter and I will be able to know by

16    2:00 o'clock on Friday whether we're going forward or not.  So

17    I can issue an order Friday evening telling Ms. An and the

18    Government whether we're going -- there are dates available

19    next week or whether we need to go forward on April 7 .

20    Ultimately, alternatively, we can schedule it for April 7th if

21    that's what you're asking.

22         MS. HARRIS:  I think that's what's safe and what

23    we're willing to do.

24         THE COURT:  What's the problem with April 7th?

25         MS. RANGEL:  We can do April 7th.  We just see no

1    reason that we couldn't just proceed next week if the Court is

2    available.

3              THE COURT:  Well, she explained why:  A lot of

4    moving parts, you don't know who is available.

5              MS. RANGEL:  But if she's arguing the sentencing,

6    then you're available.

7              MS. HARRIS:  I'm asking for two weeks, to April 7th.

8    The week of April 7th because, your Honor, we have a number of

9    lawyers.  We don't have all of our calendars, I have a tech

10   problem which is that my computer calendar is not syncing up

11   to my phone.  I apologize.  So I can't, standing here today,

12   give that availability.

13             THE COURT:  All right.  I mean, honestly, why don't

14   I just put this down, if we can, Ms. Jackson, can we schedule

15   this for April 7th.

16             The other thing you should know it is possible that

17   the trial I'm supposed to start may be kicked to April.  If

18   the lawyer needs to have surgery, and isn't available to try

19   the case until April.  But that's why I don't want to keep

20   pushing this back.

21             MS. HARRIS:  How about this?  Before we can set a

22   date in April  as a control date, if a control date is

23   necessary, I'm also -- I think given everything, we don't need

24   a control date.  But by 2 o'clock on Friday , we will advise

25   the Court of our availability both next week and dates in

1  April and then once the Court.

2            THE COURT:  Great.  Consult with the Government,

3  please.

4            MS. HARRIS:  Okay.

5            THE COURT:  So we can be on the same page on dates.

6            MS. HARRIS:  Yes.

7            THE COURT:  Is there anything else?

8            MS. RANGEL:  Not from the Government.

9            THE COURT:  All right.  We're concluded.

10            (WHEREUPON, this matter was concluded.)

11

12                              *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25